# County Court, Monroe County.

May, 1904.

# THE PEOPLE v. FRANCIS J. McFARLIN, ET AL.

(43 Misc. 591.)

CONSPIRACY OF MEMBERS OF AFFILIATED LABOR UNIONS TO COMPEL THEIR EMPLOYERS TO COMPLY WITH THEIR DEMANDS—LEGAL AND ILLEGAL METHODS AND THREATS—BOYCOTTING—A DEMAND THAT MATERIALS BE PURCHASED ONLY OF SHOPS APPROVED BY THE UNION IS IN RESTRAINT OF TRADE—CONSTRUCTION OF PENAL CODE SECS. 168, SUBD. 5, 170—DEMURRER TO INDICTMENT.

While section 170 of the Penal Code declares that the orderly and peaceable assembling or co-operation of employees, in any trade, for the purpose of obtaining an advance in the rate of wages, is not a criminal conspiracy, they can not, to accomplish that object, co-öperate to use any of the means declared to be illegal by subdivision 5 of section 168 of the Penal Code, such as "To prevent another from exercising a lawful trade or calling, or doing any other lawful act by force, threats or intimidation" nor can they "commit any act injurious     *     *     to trade or commerce."

An indictment drawn under said subdivision 5, which charges that the defendants, officers of the United Brotherhood of Carpenters and Joiners of America and also members of local unions in Rochester, embodied in a district union having severe penalties for disobedience to its mandates and comprising the greater part of the workmen employed in said city in carpenter and joiner work both in building-material factories and in outside construction

work, conspiring among themselves, and with others unknown, inaugurated strikes and boycotts in the wood-working and carpenter trades in said city, threatened to drive non-union workmen out of business and make it impossible for them to obtain work in the city unless they joined the union, and to compel acceptance of their demands threatened to boycott wood-working material manufacturers and ruin their trade unless they made an advance in wages and limited the number of apprentices, declared the output and shops of non-complying manufacturers "unfair," inaugurated strikes where their material was used and posted "unfair" notices on the material itself where it was used, threatened to boycott carpenter contractors for the erection of buildings unless they agreed in writing to purchase materials only of factories approved by the union and cancel their outstanding contracts made with "unfair" factories, and which further alleges that the threats were executed with the result that building enterprises were paralyzed in said city and many persons driven out of employment and out of business, is not demurrable.

Members of affiliated unions have a right to declare their unwillingness to work in the same shop or on the same job with a non-union man and, if he is discharged by their threat to strike or cannot get work in a shop or on a job where they are employed, no crime has been committed, but where they, for any purpose, endeavor to compel a man to join the union by threats, in case of his refusal, not only not to work with him but that, in order to prevent him from getting work at his trade, they will employ all the power of the union to turn custom away from, and promote hostility towards, any one who dares to employ him, and this as a punishment for giving him work, the co-operating members of the union are guilty of a conspiracy to prevent another from exercising his lawful trade within Penal Code, § 168, subd. 5.

Threats against the manufacturers to withdraw all union men and end all business relations, unless the demands of the union are complied with, constitute no crime, but where the manufacturers are threatened with business annihilation by the malicious use of the boycott, compelling would-be customers to desist from purchasing from fear, induced by threats, that if they do purchase the full power of the union will be used against them to their destruction, the action of the members of the union co-operating therein is illegal.

The agreement, sought to be exacted from the carpenter contractors, that they must agree to purchase materials only from factories approved by the union, is against public policy and harmful to the community because it restrains competition and freedom of trade in articles of common necessity.

DEMURRER to indictment charging conspiracy.

Stephen J. Warren, district attorney, for people.

William H. Sullivan, for defendants McFarlin, Challice and O'Brien.

Lewis E. Griffith, for defendant Guerin.

SUTHERLAND, J.

The indictment herein was presented by the grand jury of Monroe county, October 30, 1903, and the defendants are charged with the crime of conspiracy, alleged to have been committed at the city of Rochester, on or about May 1, 1903. The defendants are officers, agents and members of The United Brotherhood of Carpenters and Joiners of America. There are three local unions in Rochester, comprising the Monroe County District of Carpenters and Joiners, and the membership includes mechanics, carpenters and woodworkers employed in the erection of buildings and also in the manufacture of building materials in the various establishments in said city; and the indictment, in four counts, charges the defendants with criminally conspiring among themselves and with divers others, whose names are unknown, to commit act injurious to trade and commerce and to prevent other persons from exercising a lawful trade and calling and from doing lawful acts, by force, threats and intimidation, and by interfering and threatening to interfere with property belonging to and used by such other persons.

The only conspiracies punishable criminally in this State are those enumerated in sections 168 and 169 of the Penal

Code, and the portions of section 168 which are material to this demurrer provide as follows .

"Sec. 168. If two or more persons conspire, either :

"1, To commit a crime; or   *   *   *.

"5. To prevent another from exercising a lawful trade or calling, or doing any other lawful act, by force, threats, intimidation, or by interfering or threatening to interfere with tools, implements, or property belonging to or used by another, or with the use or employment thereof; or

"6. To commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice, or the due administration of the laws;

"Each of them is guilty of a misdemeanor."

And section 170 provides :   "No conspiracy is punishable criminally unless it is one of those enumerated in the last two sections, and the orderly and peaceable assembling or co-operation of persons employed in any calling, trade or handicraft for the purpose of obtaining an advance in the rate of wages or compensation, or of maintaining such rate, is not a conspiracy."

It is admitted in the indictment that one of the objects the defendants were seeking to accomplish was an increase in wages, and section 170, just quoted, says that the orderly and peaceable co-operation of persons for that purpose is not a conspiracy.   But to accomplish the object approved in section 170 the members of the combination cannot co-operate to use any of the means which are declared to be illegal by section 168, such as "to prevent another from exercising a lawful trade or calling or doing any other lawful act, by force, threats or intimidation," or "to commit any act injurious   *   *   * to trade or commerce."   People ex rel. Gill v. Smith, 5 N. Y. Crim. 512, opinion by Barrett, J.; affd., Gen. Term, 15 N. Y. St. Repr. 17, opinion by Brady, J.; affd., Court of Appeals, 110 N. Y. 633.   A praiseworthy

end does not justify the employment of unlawful means, and if, in order ultimately to effectuate the betterment of the condition of the members, the defendants maliciously and with the immediate and direct intention to work an injury conspired to deprive non-union men of all means of living and to bring about the destruction of the property of any one standing out against their demands, the statute was violated. And one's business is property. People v. Hughes, 137 N. Y. 29. So it is necessary to see not only what the indictment states the defendants sought to accomplish but also what methods are alleged to have been employed.

The four counts of the indictment do not differ in essentials. The second and fourth are amplifications of the first and third, respectively, and as the indictment covers thirty-six typewritten pages with various overt acts described, it would not be profitable to quote fully the averments, but it will be sufficient to state the substance of the allegations. In general it is stated that the defendants among themselves and with other members of the said unions acting under one comprehensive plan or conspiracy did inaugurate strikes and boycotts in the woodworking and carpenter trades in Rochester and threatened non-union workmen that they would drive them out of business and make it impossible for them to obtain work in Rochester unless they came into the union, and threatened the manufacturers of woodworking material that they would boycott and ruin their trade and drive them out of business if they did not accede to their demands, and likewise threatened the carpenter contractors who were engaged in the erection of buildings that they would boycott said contractors if they did not yield to the demands of the defendants; and that they carried their threats into execution. But no violence or threat to do a violent act is charged against the defendants or their fellow conspirators.

In so far as the "threat" to injure property consisted only

in the declaration of a purpose to quit the employment of any one who would not submit to their demands, the agreement so to act was not a criminal conspiracy, and if the threat was carried out the resultant injury to the property of their employers, however serious, was but an incident to the exercise of a lawful right which the striking employees possessed and could exercise singly or collectively, without incurring any liability either criminal or civil, unless there was a breach of contract. National Pro. Assn. v. Cumming, 170 N. Y. 315.

The precise dividing line may not be always easy to point out with academic precision, but I apprehend that in each case as it arises, a question for the jury is likely to be presented, whether the persons accused were only doing what they had the right to do in bestowing their favor upon their friends and withholding their business and beneficial intercourse from those whom they believed to be unfriendly, or whether, on the other hand, their immediate object and intent was to injure another in his trade or business, and the means employed exceeded the exercise of inherent rights, and were maliciously directed to that specific end.

On this demurrer the allegations of the indictment must be assumed to be true and their sufficiency in law is to be determined.

It is alleged that the unions referred to contained in their membership by far the larger part of the men employed in Rochester in the various lines of carpenter and joiner work, both in the factories where building material is purchased and outside in the actual work of construction, and that these unions were united in the district organization, and that penalties were provided for disobedience to the mandates of the union against the members thereof, by fines for the first three offenses and expulsion for the fourth offense. That the unions resolved to fix a rate of wages at two dol-

lars and twenty-five cents per day of nine hours duration and laid down certain rules for the guidance of their employers as to the number of apprentices to be permitted to learn the trade, which conditions appear in the form of an agreement, Exhibit B, to which defendants insisted that the manufacturers should become parties, as follows :

"ARTICLES OF AGREEMENT.    EX. ' B.'

"Made and entered into this first day of May, 1903, between the Interior and Exterior Woodwork and Fixture Factories, of the first part, and the Monroe County District Council of the United Brotherhood of Carpenters and Joiners of America, parties of the second part, all of Rochester, N. Y.

"First.    It is mutually agreed between the above named parties that nine hours shall constitute a day's work; that the working hours shall be from 7:00 A. M. to 12:00 M., and from 1:00 P. M. to 5:00 P M., to be known as regular working hours.

"Second.    It is further agreed between the above named parties that the minimum rate of wages shall not be less than $2.25 per day for Cabinet Makers and Machine Hands for regular working hours.

"Third.    And it is further agreed between the above named parties that work done on the following holidays:    New Year's Day, Decoration Day, Fourth of July, Labor Day, Thanksgiving Day, Christmas Day and Sundays, shall be paid for at the rate of double time, and all over time must be paid for at the rate of time and a half.    *    *    *.

"Fifth.    It is further agreed that no piece work shall be allowed, and no foreman shall take the place of a workman, or perform duties outside of his regular duties as foreman.

"Sixth.    It is further agreed that no more than one apprentice to five journeyman shall be allowed, but as many laborers as are required may be employed, but in no case

shall laborers be allowed to use tools. Anyone working at a bench or machine less than three years, and under the age of twenty-one years, shall be classified as an apprentice.

"Seventh. And it is further agreed that when men are sent outside of the factory or shop to put up work they shall observe all trade rules and articles of agreement in force between outside men and their employers, most especially as regards wages and hours, in the locality where the work is to be put up.

"Eighth. And it is further agreed that if either party wishes to change this agreement at its expiration, they shall give at least three months notice in writing.

"Ninth. And it is mutually agreed that all of the provisions of this agreement shall be binding from the first day of May, 1903, to the first day of May, 1904."

And the indictment charges that the defendants and the other members of the union conspired to force an employees of said shops, not members of the union, to join them or to arrive them out of employment in the city of Rochester (although such purpose does not appear on the face of Exhibit B), and in order to compel the acceptance of their demands by the manufacturers, the indictment charges that they declared the output of all manufacturers not acceding to their demands to be "unfair," and boycotted the output of those factories, and published and advertised the shops as "unfair," and by a system of pickets and placards singled out and followed up said materials, and ordered strikes wherever an attempt was made to use said "unfair" material in construction. It is alleged the defendants and their fellow conspirators posted the "unfair" notices upon the material itself and got the carpenter contractors together at a meeting and threatened to boycott them and drive them, severally, out of business as contractors unless they would sign a written agreement not to purchase any materials from the "unfair" factories, and to confine their purchase of

building materials to those factories whose output was approved as "fair" by the union. The form of said agreement is set forth as Exhibit A, as follows :

"Ex. 'A.'

### ARTICLES OF AGREEMENT.

"Made and entered into this          day of 190   , by and between the undersigned Carpenter Contractor of Rochester, N. Y., parties of the first part, and the Monroe County District Council of the United Brotherhood of Carpenters and Joiners of America, parties of the second part.

"First. It is mutually agreed by and between the above named parties that all mill work for jobs now under construction, as hereinafter specified, shall be declared fair material, and shall be erected and put in place on said building by the members of the U. B. of C. and J. of A., parties of the second part.

"Second. The parties of the first part do hereby agree that all material for any jobs or building not specified, shall be material or mill work known as fair trim or mill work by the parties of the second part. And they further agree not to purchase any material or trim of any kind from any person or persons that cannot furnish this quality of goods known as fair material or mill work, for all future contracts or jobs not herein specified.

"Third. The parties of the second part do hereby agree not to strike against any material or mill work that has been placed in any factory or mill now on the fair list of the parties of the second part until notice of ten (10) days is given to the parties of the first part, that said factory or mill is unfair. This notice shall not affect orders placed in fair mill or factory and goods not delivered prior to aforesaid notice,

"The following is a list of jobs that goods shall be declar-

ed fair, as heretofore specified, and goods not delivered on said job on or before date of said job, as herein mentioned, shall be unfair and not placed on job after time has expired, except such goods as are not satisfactory to owner or employer. These goods can be duplicated without violating this agreement."

And the indictment charges the defendants with endeavoring to procure the cancellation of outstanding contracts between the "unfair" factories and the carpenter contractors, by threats that the business of the contractors would be boycotted in case they fulfilled their said contracts and said contractors would be driven out of business by the defendants and their fellow conspirators. And the third count of the indictment contains an allegation in reference to a manufacturer, Charles P. Evans, that the defendants not only proceeded to drive him out of business by boycotting the contractors to whom he was selling the output of his factory and by forcing one John Erion, with whom he had an outstanding, unfulfilled contract for the sale of building material, to break the same, but also that the defendants threatened to boycott and drive out of business all persons who would sell any materials to Evans for use in said factory, in order to ccmpel Evans to sign Exhibit B. And the second and fourth counts charge in substance, that as a result of these acts and threats and by the power of the co-ordinated unions being so exercised and used by the conspirators, a paralysis was brought upon the building enterprises of Rochester; that many men were driven out of employment and out of business, and were rendered unable to complete their contracts and were financially ruined.

In so far as the threats against the manufacturers were confined to the withdrawal of the union men from their employ and the withdrawal of all business relations and intercourse between the union men and said manufacturers unless their demands were complied with, no law was violat-

ed and no illegal act threatened.    And it has been said that they may lawfully use fair argument and peruasion to influence their friends to withdraw their patronage from the manufacturers in order to bring them to terms.    But to go further and threaten the manufacturers with business annihilation, with the waging of a war of destruction against them by the malicious use of the boycott, compelling would-be customers to desist from purchasing because of fear induced by threats that if they do purchase, the full power of the organization will be focused and projected against them to their destruction—such action has never been called legal by any court, so far as my investigation has disclosed, but on the contrary was condemned at common law, and has been declared illegal by modern text-writers, and in a large number of recent decisions by judicial tribunals worthy of the highest respect.    Old Dom. Co. v. McKenna, 18 Abb. N. C. 262, opinion by Brown, J.; Hopkins v. Oxley Stave Co., 83 Fed. Repr. 912, opinion by Thayer, J.; Arthur v. Oakes, 63 id. 310, opinion by Harlan, J.; Toledo R. Co. v. Penn. Co., 54 id. 730, opinion by Taft, J.; Wabash R. Co. v. Hannahan, 121 id. 563, opinion by Adams, J.; Matthews v. Shankland, 25 Misc. Rep. 604, opinion by Spring, J.; Gray v. Building Trades Council, 97 N. W. 663, Sup. Ct. of Minn.; Davis Machine Co. v. Robinson, 41 Misc. Rep. 329, opinion by Nash, J.; People v. Barondess, 61 Hun, 581, dissenting opinion by Daniels, J., adopted by Court of Appeals, 133 N. Y. 649; People v. Hughes, supra; Eddy Comb., § 540 et seq., 6 Am. & Eng. Encyc. of Law (2d ed.), 849.

The members of these affiliated unions had the right to declare their unwillingness to work in the same shop or on the same job with any non-union man, and if by threatening to strike unless the non-union man were discharged the non-union man was thereby prevented from obtaining or continuing employment in any shop or on any job where union

men were employed, no crime was committed and no-actionable injury was done to the non-union man. National Pro. Assn. v. Cumming, supra; Wunch v. Shankland, 59 App. Div. 482. But when the members of any organization, no matter how commendable the purpose for its existence may be, endeavor to compel a man to join that organization by threatening him that unless he does so they will not only refuse to labor with him, but that in order to prevent him from obtaining work at his trade, they will utilize the entire power and enginery of the association to turn custom away from and promote hostility toward any one who dares to employ him, as a punishment for giving him work, then the members of the association who are co-operating by such means to bring about such a result are guilty of the crime of conspiracy to prevent another from following his lawful occupation, under subdivision 5 of section 168 of the Penal Code. People ex rel. Gill v. Smith, supra.

But so far as the charge relates to the prevention of non-union men from following their trade or calling, the indictment is defective in not naming the men, or some of them who were thus injured, to give the required definiteness to the charge. And while it would be manifestly impracticable to attempt to name all the non-union carpenters in Rochester in one indictment, nevertheless some specific individuals should have been pointed out, if known to the grand jury, concerning whom the defendants would then be advised that the proof at the trial is to be given. This would seem to be an elementary proposition and to need no citation of authority.

There is no uncertainty, however, as to the individuals in the manufacturing and in the carpenter-contractor business, who it is alleged were wronged, as enough of them are mentioned in the indictment to make the charge definite and precise.

So far as the carpenter contractors are concerned, it does

not appear by the indictment that there was any question between them and their employees as to wages, but it seems that they were threatened with a boycott unless they signed an agreement (Exhibit A), to purchase materials only of such factories as had received the approval of the union. If this had succeeded the defendants and their associates, it is stated, would be in a position materially to limit and restrain the entire business of construction of buildings and the manufacture of woodworking material in Rochester and to control the supply as well as the price of labor in those factories and on those buildings; and that would seem to be such a restraint upon trade and commerce as is condemned by subdivision 6, section 168 of the Penal Code.

The agreement, Exhibit A, in that feature, is against public policy and harmful to the community because it restrains competition and freedom of trade in articles of common necessity. Judd v. Harrington, 139 N. Y. 105; People v. Sheldon, id. 251; Straus v. American Pub. Assn., 177 id. 473; Adams v. Brenan, 177 Ill. 194; Marshall & Bruce Co. v. City of Nashville, 109 Tenn. 495.

The legislative policy in this State is consistent with the principles of common law in this respect. In addition to the prohibitions of the Penal Code, the recent statute against monopolies and restrictive trade agreements (Laws of 1899, chap. 690), is broad and sweeping in its declaration against all contracts or arrangements tending to promote monopolies or restrain competition in trade in articles in common use; and it makes it a misdemeanor to promote or enter into any contract or arrangement which is intended to and may produce that result. The only articles in common use excepted from the operation of the statute of 1899 are those covered by patents or other exclusive proprietary rights. Straus v. Am. Pub. Assn., supra.

By such an arrangement as we have been discussing the parties thereto and its promoters are not the only ones

affected. Whether the building contractors conceive it to be for their advantage as a class, voluntarily to enter into a contract which permanently abridges their purchasing privileges within limits to be fixed arbitrarily by a third party, or they are coerced into such agreement by said third party for the advantage of the latter, in either case the public is bound to be the loser. The welfare of the whole people is conserved by the open market and free competition among manufacturers in selling and builders in buying materials that go into the structures which the people need to have erected, and to protect the interests of the whole people the laws prohibiting contracts and arrangements in restraint of trade and commerce are to be enforced.

The character of the defendants' acts is not to be tested according to the standards adopted in other countries and in former times when labor partook of many of the disabilities of serfdom; but it is to be judged by the more enlightened conceptions of the present, when the dignity of labor is recognized, and the equal right of all men to life, liberty and the pursuit of happiness is guaranteed by the fundamental law of a free country in which, amid the incessant evolution of human affairs, the proofs are constantly recurring that there is no station too high for the laborer to attain, and no honorable ambition which he may not hope to realize.

According to the law as we understand it now to be ordained by the Legislature and interpreted by the courts, the allegations of the indictment are sufficient to put the defendants to their trial and the demurrer must be disallowed.

Demurrer disallowed.