## COURT OF GENERAL SESSIONS — NEW YORK COUNTY.

### February, 1918.

### THE PEOPLE v. EDWARD EPSTEAN et al.

(102 Misc. 476.)

1. DONNELLY ANTI-TRUST LAW—GENERAL BUSINESS LAW, §§ 340, 341— WHAT CONTRACTS AFFECTED.

The Donnelly Anti-Trust Law (General Business Law, §§ 340, 341) was intended to prevent restraint of trade and the creation of monopoly in articles of trade, and the essential element of trade is that such articles are to be bought and sold.

Not all contracts affecting the prices of articles or commodities are denounced by said statute, but only such as affect the price of articles or commodities in common use.

2. SAME—PHOTO-ENGRAVING NOT A " COMMODITY."

Under no definition can a photo-engraving be called a commodity and, even conceding that it is, it cannot be said to be in common use, a distinction emphasized by the statute.

3 SAME—MOTION TO DISMISS INDICTMENT GRANTED.

Where an indictment charging defendants with a violation of the Donnelly Anti-Trust Law alleges that there were more than forty persons, firms and corporations separately engaged in competition with one another in the business of manufacturing " and selling what are commonly known as photo-engravings which are used for the purpose of printing illustrations and pictures, and which are articles and commodities in common use," and that these persons and corporations constituted a majority of all engaged in that business in New York county, where the indictment was found, and did collectively more than ninety per cent. of said business in said county, and the minutes of the grand jury disclose that there is not an item of evidence to sustain the allegations of the indictment that photo-engraving is an " article or commodity in common use," a motion to dismiss the indictment will be granted.

MOTION to dismiss indictment charging defendants with a violation of the Donnelly Anti-Trust Act.

*Edward Swann, District Attorney (William Harman Black, Assistant District Attorney, of counsel), for People.*

*Henry Wollman,* for New York Business Publishers' Association.

*Robert C. Morris,* for Publishers' Association of New York City.

*Winthrop & Stimson,* for defendant George M. Gill.

*Deiches & Goldwater,* for defendant Henry L. Walker.

*Charles A. Brodek (Max D. Steuer, of counsel),* for defendants other than Gill and Walker.

*Phillips, Mahoney & Wagner (Jeremiah T. Mahoney, of counsel),* for Photo-Engravers' Union No. 1.

MULQUEEN, J.:

This is a motion to dismiss an indictment charging the defendants with a violation of the Donnelly Anti-Trust Act.* There are two counts, practically identical, alleging that there are more than forty persons, firms and corporations separately engaged in competition with one another in the business of manufacturing " and selling what are commonly known as photo-engravings, which are used for the purpose of printing illustrations and pictures, and which are articles and commodities in common use," and that these persons and corporations constituted a majority of all engaged in that business in New York county, and did collectively more than ninety per cent. of the said business in said county.

---

* Laws of 1889, chap. 690. See General Business Law (Consol. Laws, chap. 20). article XXII.—[REPR.

17

It is further alleged that the defendants arranged and recommended that the Photo-Engravers' Board of Trade of New York should adopt a certain scale of prices to be charged by them for photo-engraving; that with the desire of fixing and controlling for the mutual benefit of these defendants prices which they and other members of said board of trade, and such as should thereafter become members, should, in restraint and prevention of competition among them, charge for photo-engravings, these defendants agreed that they and the firms with which they were connected should adopt said standard scale of prices for their photo-engraving; that the defendants agreed and notified their customers, and caused to be sent to the Haberdasher Company, a patron of the defendant Colgan, and to the Colgan Engraving Company, with which said defendant was connected, a copy of said scale of prices.

The indictment alleges that nearly all the workmen employed by the members of the Photo-Engravers' Board of Trade of New York are members of the Photo-Engravers' Union No. 1; and that the defendants made an agreement with said Photo-Engravers' Union No. 1 to regulate the terms and conditions of employment; and that the said board of trade agreed with the union to admit to its membership all reputable photo-engraving concerns in New York City; that the union agreed that its members would work only for such photo-engraving concerns as were members of the board of trade, provided that they shall not arbitrarily nor for any but good cause refuse admission to or deny retention of membership in the said Photo-Engravers' Board of Trade of New York City.

When the motion to dismiss came on for a hearing, the defendants were represented by Mr. Steuer; Assistant District Attorney Black appeared for the People. The Photo-Engravers' Union No. 1 presented a petition to the court by its attorney, alleging that the union had a vital interest in the issue, although their officers had not been made defendants. They

alleged that on their part they had been animated solely by a desire to improve the conditions under which they labored and to secure adequate and proper wages for their services. Subsequently the New York Business Publishers' Association and the Publishers' Association of New York City also applied for leave to appear and to be heard in opposition to the defendants' motion to dismiss the indictment.

In view of the importance of the case to the respective petitioners their requests were granted. A reargument of the motion was had at which all the parties were afforded an opportunity to discuss fully the questions involved, and the court desires to express its appreciation of the aid rendered by these gentlemen on the hearing of the motion, and in the elaborate briefs submitted by them.

The motion to dismiss is based on the following grounds:

1. The terms " article " and " commodity " within the purview of the Donnelly Act include only such articles and commodities as are prime necessities.

2. Patented commodities with the monopolistic privileges granted by the act of Congress with less competition are not regulated by the Donnelly Act of this State.

3. Photo-engraving or lithographing is a process or art, the produce of which is non-merchantable, and is not a commodity within the meaning of the laws in restraint of trade.

4. The indictment does not state facts constituting a violation of the Donnelly Act or any other crime.

On behalf of the defendant George M. Gill, it is also claimed that he was not a director of the Photo-Engravers' Board of Trade at the time of the commission of the alleged criminal acts, and that this fact was not brought to the attention of the grand jury. It is clear that the defendant Gill, although not a director at the time mentioned, was fully aware of all that was done by his co-defendants, and that he aided and abetted them in the commission of the alleged crime; furthermore,

when he became a director of the said board of trade he had full knowledge of all that had been done by his co-defendants, and co-operated with them in the accomplishment of their alleged corrupt purposes. The allegation in the indictment that he was a director is not material. All persons concerned in the commission of a crime are equally liable, and the indictment must be sustained as to all of the defendants, or be dismissed as to all.

In support of the proposition that the Donnelly Act applies only to articles and commodities that are prime necessities, it is maintained that it has been held (Matter of Davies, 168 N. Y. 89, 101) that the Donnelly Law is merely a codification of the common law upon the subject; and that under the common law only combinations to create a monopoly in commodities which constitute the necessities of life, or to enhance the market price thereof, to the prejudice of the consumer, were and are criminal offenses. The Legislature, of course, has the power to abrogate or modify the common law. The progress of the legislation which culminated in the passage of the Donnelly Act clearly shows that it was the intent of the Legislature to modify the doctrine of the common law, and to denounce as criminal such agreement affecting not only the so-called prime necessities but also concerning any article or commodity in common use, whether or not such articles or commodities might be regarded as necessities. Indeed, the language of the court (People v. Davies) that " the act in this respect is little more than a codification of the common law upon the subject," clearly disproves the claim that the court regarded the act as a mere codification.

It is true that cases of criminal conspiracies of this character have been more frequent in commodities of prime necessity such as grain, meat, salt, milk and the like, probably because such offenses are more flagrant and were punishable at the common law; and that cases involving other articles of commerce were civil actions in which the court declared the contracts to be void

and refused to enforce them. This distinction was noted in Cummings v. Union Blue Stone Co. (164 N. Y. 405). But this case did not construe the Donnelly Act. It referred to People v. Sheldon (139 N. Y. 251), but that case concerned an agreement made in March, 1892, long before the enactment of the Donnelly Law.

The question now is not whether the article or commodity is a prime necessity, but rather whether it is commonly used by the people. Toys, for example, cannot be regarded as prime necessities. Yet they are articles of commerce. They are bought and sold by people of every walk in life and are exhibited for sale in countless shops. Hence, they are articles or commodities in common use, and thus within the provisions of the Donnelly Law.

The second contention, that photo-engravings are to be regarded as patented commodities, is not well founded. It is true that the claim is made that each of the defendants at some point in the creation of the photo-engraving employs a process which is protected by patent rights; but it is clear that even the owners of patents are forbidden by law from forming a combination with other producers to affect the price of their respective commodities.

The fourth ground for dismissal is that the indictment does not state facts constituting a violation of the Donnelly Act or any other agreement.

The evidence clearly establishes a contract or combination to affect the price of photo-engravings, and if that is a crime the indictment must be sustained. Whether or not the acts of the defendants were a violation of the law must be determined by a consideration of the third point, to wit, that photo-engraving is a process or art, the produce of which is non-merchantable, and is not an article or commodity in common use within the meaning of laws in restraint of trade.

It is claimed that photo-engraving calls for the highest degree

of artistic skill, chemical knowledge and optical judgment; that men standing side by side, using the same chemicals, the same apparatus and the same means or process in manufacture would or could produce so totally different results as to make one a production of artistic skill and the other of worse than no value; that from the moment that the brass plate is first prepared for cutting by a chemical process until the copper plate is finally wrought, chemical and artistic skill and judgment are required; that the engraving thus produced is not a commodity, since it is of no value to any one but the individual who ordered it for his own " special " use, and that it is not intended to be bought and sold as merchandise, and hence cannot be regarded as an article or commodity in common use.

Such is the claim in behalf of the defendants, while those who are opposed to the motion claim that the process is one of ordinary manufacture and production requiring only such skill and judgment as are shown by the workers in every industry; that photo-engravings in very large numbers are constantly used in the production of books, magazines and may be seen in the columns of the daily newspapers.

Under the circumstances, it was suggested by the parties that the court should be present at the preparation of a photo-engraving in the establishment of one of the defendants. It was there demonstrated that a photograph, proof or picture is sent to a photo-engraver for reproduction. The glass plate is first prepared by a wet or dry process, according to the judgment of the craftsman who is to make the reproducing photograph. This plate is attached to a screen having ruled thereon lines of certain length, breadth and thickness, which has been scientifically prepared. It is from the use of this screen that the process derives its name of " half-tone." The craftsman uses his individual discretion and judgment as to the character of plate required in order to bring out the tones of the objects reproduced, which may be described as high, middle and low tone, requiring also

different length of time of exposure according to the lights and shadows and depth and variation of tone colors and shadows that may be upon the picture. After a satisfactory photograph has been completed the plate is developed. After the negative has been developed it is placed in a bath to free it from the plate and placed upon another glass plate; then a copper plate, whose surface has been highly polished and sensitized, is placed against it in a vacuum form and the process of photography is again brought into use. The copper plate is then developed and the image is burned in until the printed surface becomes enameled. The plate is then etched in an acid bath and prepared for the engraver, who, it is said, must possess high artistic judgment and ability.

When the plate is finished it is attached to a wooden block and prepared for use.

This brings us to a consideration of whether photo-engraving thus produced is an article or commodity in common use within the purview of the statute.

In the Standard Dictionary we find that an article is " a particular object or substance, a material thing or a class of things; " " a ' commodity ' is an article of trade or convenience, a movable article of value, something that is bought and sold; " " ' commerce ' is the exchange of goods, production or property of every kind; especially exchange on a large scale, as between States or nations; extended trade."

Commodity has been legally defined as a convenience, profit, benefit or advantage; but in referring to commerce it comprehends everything movable that is bought or sold, except animals. (Rohlf v. Kasemeier, 140 Iowa, 182.)

" The productions of a country which become an article of sale, or in the language of Webster in his dictionary, ' in commerce, including everything movable that is bought and sold, * * * unless perhaps animals may be excepted. The word includes all the movables which are the objects of com-

merce.' " (Best v. Bauder, 29 How. Pr. 489. See, also, Shuttleworth v. State, 35 Ala. 415; Queens Ins. Co. v. State, 86 Tex. 250, in which the court said that the word " commodity " is ordinarily used in a commercial sense of everything movable and tangible that is ordinarily purchased which is the subject of barter and sale.)

See, also, People v. Klaw (55 Misc. Rep. 72). In this case the court construed the Donnelly Act and dismissed an indictment for conspiracy on the ground that plays and entertainments of the stage are not articles or commodities and that the business of leasing and controlling theatres and producing plays therein is not a trade within the meaning of the Donnelly Act.

The word " commodity " has two significations. In its most comprehensive sense it means convenience, accommodation, profit, benefit, advantage, interest, commodiousness. The word is ordinarily employed in the commercial sense of any movable and tangible thing that is produced or used as the subject of barter and sale. (6 Am. & Eng. Ency. of Law, 230, citing Shuttleworth v. State, 35 Ala. 417.)

The business of a lithographer has in two cases been expressly held to be that of labor and services. (Beck & Pauli Lithographing Co. v. Colorado Mill & El. Co., 52 Fed. Rep. 700; Central Lithographing & Eng. Co. v. Moore, 75 Wis. 170, 173.)

In the former case the court says: " It only remains to determine whether the contracts in the case at bar are the ordinary contracts of merchants for the manufacture and sale of marketable commodities or contracts for labor, skill, and materials, and this is not a difficult task. A contract to manufacture and furnish articles for the especial, exclusive, and peculiar use of another, with special features which he requires, and which render them of value to him, but useless and unsalable to others, articles whose chief cost and value are derived from the labor and skill bestowed upon them, and not from the materials of

which they are made, is a contract for work and labor, and not a contract of sale.

" The result is that these contracts were not for the sale and delivery * * * of marketable commodities. They were contracts for artistic skill and labor, and the materials on which they were to be bestowed in the manufacture of articles which were not salable to any one but the defendant when completed because impressed with special features useful only to it."

In Central Lithographing Company v. Moore the plaintiff had contracted to manufacture a large quantity of engravings and lithographs for a theatrical manager, with special features, useful to him only during a certain season, and they were completed and set aside in the rooms of the lithographer, and there burned before delivery to the manager. The court held that the contract was not one for the sale of personal property, but one for work, skill and materials, because it was not the materials, but the lithographer's work and skill, that gave the value to the finished advertisements, and was the actual subject-matter of the contract, and because that work and skill, while it attached a different value to the finished articles for the special use of the defendant, made both the parties and the materials valueless for all other purposes.

These contracts may be likened to a job that a printer does for another, and according to his directions, when the work consists of hand bills or advertisements set up in attractive form, and adapted exclusively for such person, and useless to any one else. Or an artist paints the likeness of another according to contract. It (the work) is of no use to the artist, or of any value to any one except to him whose likeness the picture represents. In all these cases it is too clear for argument that the transaction is not governed by the law of sales, but of work and labor.

In Rohlf v. Kasemeier (supra) the court said: " If we were to adopt the view so strongly presented by appellant's counsel,

it would be on the assumption that the associated words ' mer-
chandise' and ' commodity' included the wages to be paid for
labor, because labor is a sort of merchandise, subject to barter
and sale as other goods."

But the court held that labor and services are not merchandise
or commodity.

In State v. Duluth Board of Trade (107 Minn. 506) it was
said : " Labor, whether physical, intellectual or a combination
of the two, is not by any fair rule of construction an ' article of
trade, manufacture or use,' or an ' article, commodity or utility '
within the meaning of those words as used in the statute," and
the court held, "Agreements to regulate the price of personal
services    *    *    *    were not agreements in restraint of trade."

It is claimed by the defendants, therefore, that photo-engrav-
ings are not commodities in common use, if indeed the term
" commodity " can be applied to same.   They assert that they
merely perform work, that they supply labor and services.   It
is clear that the Photo-Engravers' Union No. 1 violated no law
by their contract or agreement with the defendants.   Any doubt
that may have existed on that point was removed by the recent
decision handed down since the argument of this motion in the
case of Bossert v. Dhuy (221 N. Y. 342).

The grand jury minutes show that similar combinations have
been made in thirty cities, having originated in Chicago.   For-
merly the business was in a chaotic state.   Strikes were fre-
quent, workmen and employers alike suffered loss and damage.
To-day peace reigns; the workmen receive higher wages and
enjoy many other advantages.   Disputes and differences are
amicably settled and adjusted to the profit and advantage of all
concerned in the production of photo-engravings.

The Donnelly Anti-Trust Act contemplates not only a vendi-
ble article, but a vendible article that is of " common use."   The
term " common " carries with it the idea of universality, being

for " general use; serving for the use of all." Webster's Un-abridged Dictionary.

This does not necessarily imply that the article be salable to each and every individual of the community; but it does mani-festly imply that the article be salable to more than one particu-lar individual. The language and the spirit of the act imply that the article should have a market, general or special, large or small, wherein it is capable of public sale.

A statute to prevent restraint in trade that speaks of competi-tion in the " price " of articles of commerce is certainly legisla-tion in the domain of sales. Only articles that have a market for public sale are ordinarily the subject of sale. The produc-tion of that which is of the nature of things having no market is ordinarily performance of a transaction for work, labor and services. For when a thing having by nature no market value is produced to the specific order of a particular individual it is a sale, not of a " commodity," but of work, labor and services, or, better, no sale at all. That the thing at the time of the transaction is not *in esse* is not important, except in so far as it bears on the question whether the transaction essentially is a sale or is for work, labor and services.

Pipe, for illustration, has a market whether it be made specially for a particular contract or not. Therefore, it was said in Addyston Pipe & Steel Co. v. United States (175 U. S. 211, 44 L. ed. 136) : " The contract is one for the sale and delivery of a certain kind of pipe, and it is not generally essential to its performance that it should be manufactured for that particular contract, although sometimes it may be.

" If the successful bidder had on hand iron pipe of the kind specified, or if he could procure it by purchase, he could in most cases deliver such pipe in fulfillment of his contract just the same as if he manufactured the pipe subsequent to the making of the contract and for the specific purpose of its performance. It is the sale and delivery, of a certain kind and quality of pipe,

and not the manufacture, which is the material portion of the contract, and a sale for delivery beyond the State makes the transaction a part of interstate commerce.

" Where the contract is for the sale of the article and for its delivery in another State, the transaction is one of interstate commerce, although the vendor may have also agreed to manufacture it in order to fulfill his contract of sale."

Thus the United States Supreme Court clearly distinguishes between a contract of sale, where the production of the article sold is merely incidental, and a contract for work, labor and services.

A photo-engraving is always made upon special order. It is useful to the particular individual for whom it is designed and for the particular occasion, and is useless and worthless to the public at large or to the producer in his business. In other words, a photo-engraving is non-merchantable and unsalable in the market. It has no market, general or special.

In support of the indictment, the learned district attorney and Messrs. Wollman and Morris assert that " if photo-engraving plates are not commodities or articles, then there are no articles or commodities." The business, they say, is conducted as follows:

A salesman for a photo-engraving plant comes to a publisher of a paper, periodical or school book, or a merchant or manufacturer, who gives him a picture or design of any kind — some merely consisting of letters — and tells the salesman he wishes one or one hundred photo-engraving plates made from that picture or design. The customer has nothing to do with the transaction after that, except that there is delivered to him a completed plate or plates made of copper or zinc fastened to wood. The owner of the photo-engraving establishment causes a plate to be manufactured, delivers it ready for use and receives so much per square inch for it. That fits within every definition that can be found in any dictionary or decision as to what a com-

modity is. They assert that the framers of the law were very careful. They did not wish to confine the law to what might possibly be termed only a commodity, but broadened it and said any commodity or article so that anything that by any possibility failed to come within the technical definition of commodity would come within the definition of an article. They maintain that if these photo-engraving plates are not a commodity, then the type which is used by all newspapers and printers of the world, each shop having its own individual type, is not a commodity; that custom-made shoes made in thousands of custom shops in the United States are not commodities; men's suits and women's dresses made to order in tens of thousands of tailor shops in the United States, and hundreds of other things made to order, are not commodities.

They cite the decision of PARKER, J., in Best v. Bauder (*supra*). They also cite the opinion of BISSELL, J., in American League Baseball Club of Chicago v. Chase (86 Misc. Rep. 441), in which a commodity is defined as: " That which is useful; anything that is useful or serviceable; particularly an article of merchandise; anything movable that is the subject of trade or of acquisition."

It seems to me that their claim is not well founded. The case is admittedly of great importance, and not altogether free of doubt. It cannot be disputed that the Donnelly Anti-Trust Law was intended to prevent restraint of trade, to prevent the creation of monopoly in articles of trade, and the essential element of trade is that the article is to be bought and sold. Taking the word " commodity " in its ordinary acceptation as " an article bought and sold," or as Judge BISSELL said, " particularly an article of merchandise," it is clear that the term refers to an article which may be the object of commerce, may be bought and sold, whereas a photo-engraving is never made to be bought and sold, since it is made for the special uses of the person who orders it. A photo-engraving plate is in the class

of articles like the lithographs which were held not to be commodities.    (Beck & Pauli Lithographing Co. v. Col. Mill & El. Co., *supra;* Central Lithographing & Engr. Co. v. Moore, *supra.*)

The contention of the district attorney and the others that photo-engraving is an article cannot be disputed, but the statute said "an article or commodity in common use." My attention has not been called to any article of that kind which was not a commodity, and since the statute was intended for the protection of all the people, and not in the interest of any individual or portion of the community, it seems clear to me that there is no difference between the words "article" or "commodity" as used in the statute.    (Shuttleworth v. State, *supra.*)    The articles mentioned by the learned attorneys, such as type, custom-made shoes, men's suits and other things made to order are commodities no matter how they are produced. Clothing and shoes are sold in shops in all the countries of the world and purchased by people.    I venture to assert that no one ever saw a shop for sale of photo-engravings. Type is used in every printing establishment.    It is an article in universal use.    In every village of the land type is used.    In other words, the articles mentioned by these gentlemen are commodities in common use.    An agreement in restraint of their production, manufacture or sale, or for the purpose of affecting their price, is clearly a violation of the Donnelly Law.    So articles like oil, tobacco, pipe, bath tubs, books.    They are all articles or commodities in common use.

In the case of Cummings v. Union Blue Stone Co. the court said: "The stone had been for many years and still is in use for sidewalks, crossings, curbing and gutters in the eastern and southern cities of the United States, and in the construction of bridges, fountains, basins, floors and for trimmings in the interior walls of buildings and for various other purposes."

Nor do I think that the decision in the case of Merchants Legal Stamp Co. v. Murphy (220 Mass. 281) supports their

contention. Massachusetts has a statute similar to the Don-
nelly Law, and the court held that under that statute trading
stamps, if not goods, wares and merchandise as those terms
ordinarily are used, did represent and were intended to repre-
sent a mode of doing business which under modern mercantile
conditions is in itself a business potentially affecting and largely
prevailing in certain well recognized lines of trade.

The books of stamps when viewed in the light of their manu-
facture and use by the plaintiff, coupled with its contract treat-
ing them not as symbols but as chattels of value which are the
subject of sale or of bailment, are to be deemed " articles within
the meaning of the statute."

It was decided that the plaintiff could not legally refuse to
supply such stamps to merchants who declined to stipulate not
to use trading stamps issued by other companies or individuals;
and that the insertion of this provision in the contract was to
suppress all competition. In other words, the court held that
the plaintiff was obliged to supply such stamps to all persons on
the same terms and without imposing conditions that would
suppress competition not only in the purchase or sale of the
stamps, but in business generally, because, they said, such a sys-
tem of business would result in such concentration as to sub-
stantially control prices for a form of services or of supposed
profits to purchasers demanded by the *public*.

They also cite the case of National Harrow Co. v. Bement &
Sons (163 N. Y. 505). That case refers to an article known as
a float spring tooth harrow. The court held that a harrow is
an implement as important and as generally used by farmers as
a plow, and is quite as necessary for the proper cultivation of
land as any other agricultural implement, and is in use on every
properly cultivated farm. In other words, a harrow is a com-
modity just as much as a plow. The court held that it was
universally used. A contract or an agreement to affect the price
or the production, distribution or sale of such an article would

272 NEW YORK CRIMINAL REPORTS, VOL. XXXVI.

be illegal. But it does not support the contention of the People in the present case. A harrow is a commodity in common use, like shoes, clothing, milk or other articles of food, or tobacco, oil, pipe or bathtubs, which are commodities without regard to the question of how the individual article under investigation is made. This case of National Harrow Co. v. Bement & Sons, and the case of Merchants Legal Stamp Co. v. Murphy (*supra*), therefore do not support in any way the contention of those who. oppose the dismissal of this indictment.

It seems to me that the district attorney entirely ignores the words in common use which the Legislature carefully inserted in the statute. Not all contracts affecting the prices of articles or commodities were denounced by the statute, but only such contracts as affect the price of articles or commodities *in common use*. Under no definition that I have seen can a photo-engraving be called a commodity. It is simply a substitute for wood engraving or steel engraving, or engraving on stone which formerly performed the service now rendered by the photo-engraving. Even if it be conceded that it is a commodity, it cannot be said to be in common use, a distinction which the law emphasizes, and which was made by the courts before the enactment of the Donnelly Law.

The agreement of the photo-engravers differs in no respect from that made by the members of the Institute of Architects, who, it is well known, agree upon the compensation to be demanded for the preparation of plans and specifications. They produce plans and blue prints and specifications. Certainly the erection of houses and the construction of buildings are great industries practiced all over the world. It might be claimed that the plans and specifications or the blue print of the design for such building was an article in common use or a commodity. It certainly is not a commodity if it is made to order for a specific use. It might become such a commodity if produced for sale to the public in general to be used by any one who might

purchase it. It is an article, however, just as a photo-engraving is an article, but surely it cannot be claimed that the Donnelly Law made it a crime for architects to make such agreement concerning their compensation.

The scope of the Donnelly Law is broad. It amply protects consumers from the exactions of all who might seek otherwise to create a monopoly affecting the prices of articles in common use. By that phrase, I maintain the statute meant the articles used by the people in general; such articles or commodities as are in general use or used to a great extent in the homes of the people, the articles which are produced to be sold to the people, to be consumed and used by the people in general, and to be found for sale in all the marts of trade. No one has alleged that a photo-engraving is ever seen on sale in any shop in any place.

To form any other construction of the statute would completely eliminate the words in " common use " and utterly defeat the purpose of the legislation.

I do not agree with the defendants' contention that the statute refers only to articles of necessity. I maintain that it relates to all articles or commodities made for the pleasure, the comfort, the convenience, the profit or the use of the people as a whole. A toy may not be a necessity, but it may equally benefit the child of the rich man or the workingman. Yet toys are made for sale. They are found in all the marts of trade, produced to be purchased by all who may seek to use them. Books may not be necessities; magazines may not be necessities, but they are commodities. The only cases which refer even remotely to photo-engravings are those in which it was held that lithographs — which resemble photo-engravings — are not commodities. And while those cases did not arise under the Donnelly Act or similar acts, yet in them the distinction is clearly drawn between articles in general use and articles of special and limited use.

I believe therefore that neither the members of the labor union

nor their employers have violated the law. I believe that they have successfully supported their contention that their agreement is not only innocent, but that it has resulted in bringing harmony and stability where formerly chaos, contention and disorder were found. The business in which these defendants are engaged cannot be called manufacture or production or sale within the ordinary sense of those terms. The employees give their services and their employers provide a place for them to ply their trade or calling, and supply them with the necessary tools and implements and materials. Photo-engraving is rather to be regarded as an art or process. The defendants are not prohibited by the statute from dictating the terms on which they shall render their services, since their labors cannot in any proper sense be said to result in the production or sale of an article or commodity in common use.

It was argued that the motion to dismiss should be denied, since the defendants had in reality demurred to the indictment on the ground that the facts stated do not constitute a crime. As the demurrer had not been put in writing, the opponents of this motion assert that it must be disregarded. There is no merit in this contention. The defendants have not interposed a demurrer. They have pursued the proper remedy. The indictment clearly stated facts to constitute a crime. Hence, a demurrer would not lie.

· The presumption is that an indictment is based upon legal and sufficient evidence, until there is satisfactory proof to the contrary. It can be set aside at any time when it appears that the *evidence before the grand jury* was insufficient to sustain it, but otherwise, when presented in due form, it imports absolute verity. To support such motion, access to the grand jury minutes is indispensable. Hence, the defendants moved for an inspection of the grand jury minutes, and the court granted the motion. The minutes are now before us, and there is not an item of evidence to sustain the allegation that photo-engraving

is an "article or commodity in common use;" hence, the indictment must be dismissed.

The motion to dismiss the indictment is therefore granted.

Motion granted.

---

# NOTE ON ILLEGAL MONOPOLY CONTRACTS.

General Business Law, § 340.

GOOD FAITH.

Motive, intent or good faith of defendant is immaterial. The only questions presented are whether a contract agreement, arrangement or combination was entered into, and whether a monopoly in the manufacture, production or sale of an article or commodity in common use was or might thereby be established or maintained, or competition in the supply or price of such article was or might thereby be restrained or prevented. (People v. Morrison [1917], 98 Misc. 555.)

CONSTITUTIONALITY OF ACT.

The constitutionality of sections 340 to 346 is well established. (Matter of Davies [1901], 168 N. Y. 89.)

PURPOSE.

The purpose of section 340, etc., is to destroy monopolies in the manufacture, production and sale in this State of commodities in common use, to prevent combinations in restraint of competition in the supply or price of such commodities, or in the restraint of the free pursuit of any lawful business, trade or occupation. (Matter of Davies, 168 N. Y. 89; Matter of Attorney-General, 124 App. Div. 401; Matter of Jackson, 57 Misc. 1.)

COMMON-LAW DOCTRINE.

This article is little more than a codification of the common law on the subject. (Matter of Davies, 168 N. Y. 89; Booth v. Seibold, 37 Misc. 101; Matter of Jackson, 57 Misc. 1; People v. American Ice Co., 120 N. Y. Supp. 443.)

PUBLIC POLICY.

A combination whose tendency is to prevent competition and to control prices is against public policy and illegal. (People v. North River Sugar

Refining Co., 22 Abb. N. C. 164; Cummings v. Union Blue Stone Co., 164 N. Y. 401.) While healthy competition is favored, public policy abhors favoritism, secret rebates and unfair dealings and commends the conduct of business in such a way as to serve all consumers alike. (Park, etc., Co. v. National Wholesale Druggists' Ass'n, 175 N. Y. 1.)

"ARRANGEMENT."

The term "arrangement," as used in section 340, has a broader meaning than "contract," "agreement" or "combination"; it may include each and all of these things and more. (People v. American Ice Co., 120 N. Y. Supp. 443.)

LIMITATION OF PRODUCTION.

Any agreement among manufacturers which limits the amount which each is to manufacture is an agreement whereby competition in the supply of the articles covered by the contract may be restricted. (Straus v. American Publishers' Ass'n, 85 App. Div. 446, aff'd 177 N. Y. 473.)

REFUSAL TO MAINTAIN TRADE RELATIONS WITH PARTY.

The facts that a concern controls ninety per cent. of a certain trade and had appointed a sole selling agent for this State, who refuses to sell goods to a certain party, does not show an illegal combination. It is an inherent right of every person to refuse to maintain trade relations with any other person. (Locker v. Am. Tobacco Co., 121 App. Div. 443, aff'd 195 N. Y. 565.)

PURCHASE OF BUSINESS WITH TRADE RESTRICTIONS.

The purchase of a going business, accompanied by an agreement not to engage in the same business for a limited time and within a prescribed district, is not necessarily in and of itself an illegal transaction or a violation of the statute. (People v. American Ice Co., 120 N. Y. 443.)

MERGER.

Section 340 does not prohibit the merger of two street railway companies. (Atty.-Gen. v. Interborough Metropolitan Co., 125 App. Div. 804; Continental Securities Co. v. Interborough Rapid Transit Co., 207 Fed. 467.)

PURCHASE OF STOCK OF OTHER CORPORATIONS.

If the purchase of stock by one corporation is done with the intent of effecting a combination in violation of the statute, it may be unlawful. (Matter of Atty.-Gen., 32 Misc. 1; Matter of Davies, 168 N. Y. 89. But see Matter of Consolidated Gas Co., 56 Misc. 49, and Matter of Atty.-Gen., 124 App. Div. 401.)

LEASING PROPERTY.

One is not prevented from selling or leasing property or from buying or leasing property to prevent competition; and a corporation sued for the rent of a distillery cannot escape liability upon the ground that it is engaged in a combination to create a monopoly of commodities in common use, where there is no evidence that the landlord was a party to the combination. (Brooklyn Distilling Co. v. Standard Distillery and Distributing Co., 120 App. Div. 237, aff'd 193 N. Y. 551.)

LABOR UNIONS.

A bakers' union, upon the refusal of plaintiff to unionize his bake shop, is within its legal rights in publishing and distributing a circular calling attention to the fact that plaintiff conducts a nonunion shop, soliciting its sympathizers and friends to withdraw their patronage or to refrain from patronizing plaintiff. But where, as a result of the various acts complained of, plaintiff's business has been injured, his receipts have materially fallen off and he has suffered many annoyances and inconveniences, and if continuance of these acts will result in his financial disaster, he will be granted a judgment against the individual defendants, the defendant union, its officers, agents and employees, restraining them and each of them from congregating in front of plaintiff's shop, from marching up and down the sidewalk in front of the shop, from blockading the entrance thereto and from in any way or manner preventing intending customers from entering or departing from his shop or in any manner by threats, violence, intimidation or force interfering with his employees or those who may seek employment from him. (Heitkamper v. Hoffman [1917], 99 Misc. 543, 164 N. Y. Supp. 533.)

SAME.

The social principle which justifies the organization of a labor union is departed from when they are so extended in their operation as to intend or accomplish injury to others, and if the purpose of contracts or arrangements with employers is to coerce other workingmen to become members of the organization under the penalty of the loss of their position, that purpose is clearly unlawful. (Curran v. Galen, 152 N. Y. 33.)

Members of unions have a right to declare their unwillingness to work in the same shop or on the same job with a nonunion man, and if he is discharged by their threat to strike, or cannot get work where they are employed, no crime has been committed; where they endeavor to compel a man to join the union by threats to prevent him from getting work at his trade, the members of the union may be guilty of a conspiracy to prevent another from exercising his lawful trade. (People v. McFarlin, 43 Misc. 591, 18 N. Y. Crim. 412.)

A labor union may refuse to permit its members to work with fellow-servants who are members of a rival organization, and may notify the employer to that effect and that a strike will be ordered unless such servants are discharged, where its action is based upon a proper motive, such as a purpose to secure only the employment of efficient and approved workmen, or to secure an exclusive preference of employment to its members on their own terms and conditions, proivded no force is employed and no unlawful act is committed. (Nat'l Pro. Ass'n of Steam Fitters, 17 N. Y. 315.)

Threats against the manufacturers to withdraw all union men and end all business relations unless the demands of the union are complied with constitute no crime; but where the manufacturers are threatened with business annihilation by the malicious use of the boycott, compelling would-be customers to desist from purchasing from fear, induced by threats that if they do purchase the full power of the union will be used against them to their destruction, the action of the members of the union cooperating therein is illegal. (People v. McFarlin, 43 Misc. 591, 18 N. Y. Crim. 412.)

An agreement sought to be exacted from carpenter contractors that they must agree to purchase materials only from factories approved by the union is against public policy and harmful to the community because it restrains competition and freedom of trade on articles of common necessity. (People v. McFarlin, 43 Misc. 591, 18 N. Y. Crim. 412.)

SUFFICIENCY OF INDICTMENT.

An indictment charging a violation of this section must sufficiently allege either that defendants entered into a contract or arrangement by which a monopoly was created or competition restrained or that they entered into a contract or arrangement whereby those results might be attained. (People v. Baff [1917], 98 Misc. 547, 164 N. Y. Supp. 709.)

Thus, an indictment for a violation of this section was held to be insufficient where, after alleging that on a certain day defendants with other individuals and firms were engaged in competition with each other and others not named in the business of buying at wholesale seventy-five per cent. of the live poultry bought in that part of the city of New York in which they dealt, that certain of said defendants became a domestic corporation for the pretended purposes of buying, selling and otherwise disposing of live poultry, and that said defendants became directors of and dominated the acts, agreements and business of said corporation, it charged that said defendants agreed that all live poultry acquired, bought, used and kept for sale by each of them and by the other individuals and firms mentioned should be purchased by and through the corporation and that the

defendants and the other individuals and firms mentioned should sell such poultry only at prices fixed and to be fixed by the said corporation and by said defendants. The indictment did not allege that defendants were in any position to influence, by persuasion or coercion, their other competitors to assent to the proposed contract, nor did it allege, that defendants had any influence or control whatever over said competitors, or that the combination was ever carried out. In this case the order sustaining the demurrer directed that the case be submitted to the same or another grand jury. (People v. Baff [1917], 98 Misc. 547, 164 N. Y. Supp. 709.)

The case was resubmitted and it was held that where a new indictment is returned without the taking of any additional testimony, a motion to set aside the indicement for failure of the grand jury to examine the witnesses anew before finding it will be denied. It was held, however, that a motion would be granted to set aside the indictment upon the grounds that the evidence before the grand jury failed to show that the defendants committed the crime charged therein, and that incompetent testimony was received in support thereof. (People v. Baff [1915], 90 Misc. 684, N. Y. Supp. 136.)

## STOCK EXCHANGE.

A resolution of the New York Stock Exchange prohibiting its members from buying or selling stocks for any active member of the Consolidated Exchange, a rival organization engaged in the same business, is not illegal as in restraint of trade. (Heim v. New York Stock Exchange, 64 Misc. 529.)

## TELEGRAPH COMPANIES.

Telegraph companies are not included within the condemnation of section 340. (Matter of Jackson, 57 Misc. 1.)

## COMBINATION OUTSIDE STATE.

An act in this State pursuant to a combination entered into without the State is prohibited. (Matter of Attorney-General, 32 Misc. 1; Matter of Davies, 168 N. Y. 89.)

## BOOKS — PUBLISHERS.

Books are " articles or commodity in common use," and a combination of publishers representing ninety-five per cent. of the book publishers in the United States that all copyrighted books published by any of them should be sold at retail at the published price thereof and that they would sell books only to such booksellers as would maintain the retail price of copyrighted books, and only to those booksellers and jobbers who would sell books at wholesale to no one who was known to them to sell the copyrighted books lower than the retail price and not to anyone whose name

should be given to them by the corporation, as one who had cut prices, has been held within the condemnation of the statute where by means of certain restrictions and prohibition it also constituted a restraint on uncopyrighted books.   (Straus v. American Pub. Ass'n, 85 App. Div. 446.)

The distinction between copyrighted and uncopyrighted books was adhered to on a subsequent appeal reported in 193 N. Y. 496, but an appeal to the United States Supreme Court was reversed (231 U. S. 222) on the ground that the copyright laws had no such far-reaching effect as given them by the New York Court of Appeals and that the agreement was invalid under the Sherman Act.

## NEWS ITEMS
This section does not cover items of news.   (Opin. Attorney-General, 531.)

## INTERIOR TRIM.
Interior trim is an article of common use.   (Irving v. Neal, 209 Fed. 471.)

## PROPRIETARY GOODS.
An agreement between the manufacturers of proprietary medicines and an association of wholesale dealers in such articles to sell their goods at a uniform jobbing price for fixed quantities to such dealers only as would conform to the manufacturers' price list in making sales of goods does not establish a monopoly where all wholesale dealers have the right to purchase goods upon the same terms as the members of the association, upon undertaking to maintain the price established by the manufacturers.   (Park v. Nat. Wholesale Druggists' Ass'n, 175 N. Y. 1.)

## REMEDY.
One who is directly affected by an illegal combination is entitled to appeal to the courts for redress, either to restrain the continuance of the illegal acts which result from the illegal combination or to recover damages caused by such continuation.   (Rourke v. Elk Drug Co., 75 App. Div. 145; Straus v. Am. Pub. Ass'n, 85 App. Div. 446, aff'd 177 N. Y. 473.)