[S. F. No. 10079. In Bank.—January 30, 1924.]

OVERLAND PUBLISHING COMPANY, Appellant, v. H. S. CROCKER COMPANY, INC., et al., Respondents.

[1] MONOPOLIES—COMBINATION TO FIX PRINTING PRICES—CARTWRIGHT LAW—ACTION FOR DAMAGES.—Where the complaint in an action for damages under the Cartwright Anti-trust Act charges the members of the "Printers' Board of Trade," to which plaintiff does not belong, with a conspiracy to fix and control the price of commodities in which the defendants deal, at a figure greater than would allow a reasonable profit upon the same, no cause of action in plaintiff for conspiracy is shown, where it appears that he is at liberty to bid on such work freely and without limit and is not damaged by the action of the defendants, but rather benefited thereby.

[2] ID.—SUFFICIENCY OF COMPLAINT.—It is held that the complaint in this case, in its entirety, contains sufficient allegations of unlawful acts claimed to have been done by the defendants in pursuance of their alleged conspiracy against trade, to state a cause of action under the Cartwright Act for double damages.

[3] ID.—CONSPIRACY TO CONTROL LABOR—PLEADING.—Where it is alleged in effect in the complaint in such action that an agreement existed between the "Printers' Board of Trade" and certain unions, whose memberships embraced all competent employees in this line of business, under which agreement the unions agreed that none of their members should work for a concern that did

---

1. Control of prices by illegal combination, notes, 2 Ann. Cas. 956; 9 Ann. Cas. 299; Ann. Cas. 1912D, 769.

not belong to the former association, and it is further alleged that defendants, for the purpose of forcing plaintiff into said association, or in the alternative crushing it, ordered the unions to withdraw their men from plaintiff's employ, the allegations are sufficient to connect the leaving of plaintiff's employ by the union men with the previously alleged conspiracy.

[4] ID.—ILLEGAL CONTRACT — RESTRICTION ON TRADE. — The primary purpose of such agreement between the "Printers' Board of Trade" and the unions being to create or carry out restrictions in trade or commerce, the contract is tainted with illegality.

[5] ID.—RIGHT TO WORK OF REFUSE TO WORK.—Such an agreement cannot be upheld upon the theory that it is the right of every man to engage to work for or to deal with or to refuse to work for or to deal with any man or class of men as he sees fit, whatever his motive or the resulting injury, without being held in any way accountable therefor, as this principle only applies where the employees are pursuing lawful means to secure betterment of their working conditions, or where they have in fact a grievance against the employer.

[6] ID.—LABOR—COMMODITY—CARTWRIGHT ACT.—The proviso in the Cartwright Act that labor, skilled or unskilled, is not a commodity within the meaning of the act does not authorize any such agreement as that between the "Printers' Board of Trade" and the unions.

[7] ID.—PARTIES—UNIONS—CARTWRIGHT ACT.—As such agreement results in a combination or conspiracy in restraint of trade, it falls within the operations of the Cartwright Act, notwithstanding the fact that some of the parties are labor unions.

[8] ID.—SEPARATE LAWFUL ACTS—UNLAWFUL PURPOSE—CONSPIRACY. Although separate acts may in themselves be innocent and lawful, various of such acts done by members of a trust, as defined in the Cartwright Act, in pursuance of an unlawful conspiracy and to effectuate an illegal object, may become unlawful.

[9] ID.—PLEADING—PROOF.—While it is necessary for the plaintiff, in order to recover under the Cartwright Act, to show that actual damages were sustained—damages in some amount which are susceptible of expression in figures and not dependent upon the conjecture of a jury—this is a question of proof and plaintiff is not required to itemize its damages in the complaint.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Franklin A. Griffin, Judge. Reversed.

The facts are stated in the opinion of the court.

Hoefler, Cook & Lingenfelter and George F. Snyder for Appellant.

Harry G. McKannay for Respondents.

KERRIGAN, J.—This is an appeal by plaintiff from a judgment entered upon an order sustaining a demurrer to plaintiff's amended complaint without leave to amend.

Plaintiff in its complaint seeks to allege a cause of action under the Cartwright Act (Act 4166, Gen. Laws of Cal. [1915] Deering, Stats. 1907, p. 984, as amended by Stats. 1909, p. 593) for double damages by reason of certain acts of defendants, who constitute, it is alleged, a trust, as defined by that act. Before discussing the many and lengthy allegations of the complaint, we will refer to those parts of the Cartwright Act upon which plaintiff relies.

By this act a trust is defined to be a combination of " . . . two or more persons . . . (or) corporations . . . for either, any or all of the following purposes: (1) to create or carry out restrictions in trade or commerce, (2) to limit or reduce the production, or increase the price of merchandise or of any commodity, (3) to prevent competition . . . (4) to fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise . . . (5) to make . . . contracts, obligations, or agreements of any kind or description, by which they shall bind or have bound themselves not to sell . . . any article of trade . . . below a common standard figure or fixed value. . . . " And by section 11 of the act, it is provided that any person who shall be injured by anything declared to be unlawful by this act may sue therefor and recover twofold damages.

With this brief summary of the provisions of the Cartwright Act, we will proceed to examine the various allegations of plaintiff's complaint, in order to ascertain whether it has brought itself within the terms of the act.

The plaintiff alleged that it and the defendants are all engaged in the business of selling stationery, letter-heads, office supplies, paper, books, etc.; that the defendants control ninety per cent of said business in the city and county of San Francisco; that the defendants are members of a certain association known as "Printers' Board of Trade"; that

plaintiff has been invited and urged to join said association, but has refused to join the same. Details of the practices of said Board of Trade are then pleaded, substantially as set forth in the case of *Overland Publishing Co.* v. *Union Lithograph Co. et al.*, 57 Cal. App. 366 [207 Pac. 412] (hearing denied by this court June 15, 1922).

The allegations as to these alleged unlawful practices are, briefly, that the defendants have unlawfully combined and agreed together to carry out certain restrictions in the printing business; that they unreasonably increase to themselves the prices at which they sell the various articles of stationery mentioned in the complaint and the prices of printing, ruling, and binding which is done by them. It is also alleged that a committee representing the Board of Trade meets daily, and that, according to the rules of said board, each member of the board reports to this committee all their jobs amounting to fifteen dollars or over, and that in the event that several members have been asked to bid upon the same job, these members and the committee determine the price to be charged for such work. Lots are then cast to determine which member of the board shall do the work at the price previously agreed upon. It is also alleged that the board issues a catalogue of prices of stationery, printing, ruling, and binding and that the defendants have agreed to abide by these prices, which are much higher than would give to the defendants a reasonable profit.

[1] These allegations are of facts which constitute the "Printers' Board of Trade," an association whose purpose is to fix and control the price of the commodities in which the defendants deal at a figure greater than would allow a reasonable profit upon the same to the defendants. However, as pointed out in *Overland Publishing Co.* v. *Union Lithograph Co., supra*, such practices as alleged restrict competition among the members of the said "Printers' Board of Trade," but plaintiff, not being a member of said association, is at liberty to bid for printing work freely and without limit as to the price to be charged therefor. Plaintiff, therefore, is not damaged by such action of the defendants, but rather benefited thereby, and consequently cannot show special damages to itself by reason of the existence of these restrictions. Assuming, in passing, that these allegations establish the fact that a conspiracy against trade exists,

still the plaintiff having failed to show that it suffered damages, an action against the defendants because of such conspiracy can only be brought by the attorney-general or the district attorney. (Cartwright Act, sec. 2.) Thus, it has been often held by the federal courts that an individual cannot recover under section 7 of the Sherman Anti-Trust Law (Act of July 2, 1890, 26 Stats. at Large, p. 209, c. 647 [4 Fed. Stats. Ann., 2d ed., p. 1062; U. S. Comp. Stats., sec. 8829]), though the defendants might have been subject to a criminal prosecution by the government. (*Keogh* v. *Chicago & N. W. Ry. Co.*, 271 Fed. 444; *Motion Picture Patents Co.* v. *Eclair Film Co.*, 208 Fed. 416.)

[2] We are of the opinion, however, that the complaint, in its entirety, contains sufficient allegations of unlawful acts claimed to have been done by the defendants, in pursuance of their alleged conspiracy against trade, to state a cause of action under the Cartwright Act for double damages.

[3] The most important of plaintiff's allegations is. substantially, that all the journeymen printers, pressmen, and bookbinders in San Francisco are members of their respective unions, and that it is impossible to secure competent employees in the printing and stationery business without employing members of said unions. Further, it is alleged that in pursuance of the unlawful combination and conspiracy, and for the purpose of utterly destroying the business of all nonmembers of their associations, or, as the alternative, of forcing all nonmembers engaged in said business to join said organizations, the defendants, on November 23, 1920, entered into agreements with said unions whereby the unions agreed that their members should work for only such printing, ruling, or binding concerns as belong to and are members of the associations of the defendants, and that the members of said unions should not work for any concern not a member of the associations of the defendants. It is further alleged that the effect of said agreement is to frighten away the customers of such nonmembers by reason of the fact that the defendants could compel the unions to call out the union employees of such nonmembers and thereby prevent orders from being filled; that during the month of January, 1921, the defendants did threaten the plaintiff that, unless plaintiff should join the associations of the defendants, the defendants would have the union em-

193 Cal.—8

ployees of the plaintiff called out; that upon plaintiff's refusal to join said associations the defendants ordered said unions to call out plaintiff's union employees, and on the first day of February, 1921, solely pursuant to an order of the defendants, and for no other reason whatsoever, the officers of said unions ordered plaintiff's union employees to cease their employment with plaintiff, and thereupon, on said date, solely by reason of said order of the defendants and for no other reason whatsoever, plaintiff's union employees ceased their employment with the plaintiff.

It is true that in *Overland Pub. Co.* v. *Union Lithograph Co., supra,* there is some language which apparently upholds the legality of the alleged agreement between the "Printers' Board of Trade" and the unions, but it otherwise appears that the basis of the conclusions of the district court of appeal in that case was that "There are no allegations establishing a causal connection between the plaintiff's grievance, i. e., the withdrawal of the union printers and these averments regarding the methods of the Printers' Board of Trade." If this be the correct interpretation of the decision in that case, and we believe that it is, it was unnecessary to pass upon the legality of this agreement, because, assuming that it was illegal, the complaint as there framed did not show the causal connection between the methods of the "Printers' Board of Trade" and the withdrawal of the union men in pursuance of their agreement with the board. The complaint in the case now before us does allege the necessary causal connection. It alleges the agreement between the "Printers' Board of Trade" and the labor unions. Then it alleges that the defendants, in order to force the plaintiff into its association (and it had previously been alleged that this association constituted a conspiracy against trade), ordered the unions to call out the union men in plaintiff's employ. If further allegations are needed in order to connect the practices of the alleged conspiracy and the withdrawal of the plaintiff's men, it is contained in the XVIII allegation of the complaint, which is: "That each and every and all of the acts and things hereinabove alleged to have been done by the defendants, and each and every and all of the acts and things hereinabove alleged as now being done by the defendants, have been done and now are being done by them in pursuance of

the said unlawful combination, conspiracy, confederation and agreement of the defendants hereinbefore alleged, and in carrying out the same and the purposes thereof.'' Since the plaintiff sufficiently connects the action of the union men in leaving its employ with the alleged conspiracy, it becomes necessary to pass upon the legality of the agreement between the ''Printers' Board of Trade'' and the labor unions.

[4] There is no question in our minds but that the primary purpose of this agreement was to create or carry out restrictions in trade or commerce, and as such was tainted with illegality. As was said in *Brescia Construction Co.* v. *Stone Masons' Contractors Assn.*, 195 App. Div, 647 [187 N. Y. Supp. 77, 80], ''The essential facts here appearing differ radically from those cases which have frequently arisen which involved the right of members of labor unions to refuse to work for those who do not employ union labor, or to pursue lawful means for inducing those who do not engage labor union men to do so, or to pursue lawful methods for securing betterment of conditions under which to work, including such matters as hours of work and wages. In the instant case we find that the defendant labor unions, in effect, entered into an alliance with the Contractors' Association under which the members of the union agreed to work exclusively for members of the Contractors' Association and to help it to enforce its decrees against expelled members, or, for that matter, perhaps against any persons or firms engaged in the mason trade who were not members of the Contractors' Association. The defendant unions had no grievance against the plaintiff. The grievance was that of the Contractors' Association, which utilized the labor unions to enforce its mandates against other contractors who were not affiliated with it.'' Again, in *Campbell* v. *People*, 72 Colo. 213 [210 Pac. 841, 842], the court said: ''As to the first point, the only question under the first count is whether the agreement of the members of the Master Plumbers' Association and the members of the local union that they should neither employ nor be employed by any one except each other was a restriction on 'the full and free pursuit' of the business of plumbing. If the pursuit of the business is, by reason of the restriction, not full, or not free in any respect, the combination to 'create or carry

out' the restriction is unlawful. That the business, under the restriction, is not full or free seems clear.'' Notwithstanding the difference in wording in the Colorado anti-trust law and the Cartwright Act, the last cited case is in point, and it correctly characterizes such agreements between employers and labor unions as illegal.

Defendants urge, however, that provisions substantially the same as herein pleaded, were considered in *People* v. *Epstean,* 102 Misc. Rep. 476 [170 N. Y. Supp. 68]. In that case there was an agreement between the Photo-Engravers Board of Trade and the Photo-Engravers Union, in many respects similar to the one herein alleged to be in effect between defendants and the various unions. The defendants were indicted under the Donnelly Anti-Trust Act of New York (Gen. Bus. Laws [Consol. Laws, c. 20], secs. 340, 341), declaring contracts creating a monopoly illegal and void and prescribing a penalty. The court held that this law extended only to such contracts as affected the price of an article or commodity in common use, which terms do not include photo-engraving. If the photo-engraving trade was not within the scope of the New York anti-trust laws, it necessarily follows that an agreement between employers and employees, even though it prevented competition in this trade, would not be illegal. It is manifest, therefore, that the decision in that case is to be limited to the situation as there presented, and that whatever the court may have said with respect to such agreements in general between employers and labor unions, by which the latter agree that union men shall only work for employers belonging to an employers' association, was mere *dicta*.

It is interesting to note the subsequent history of the relations of the Photo-Engravers Board of Trade and the Photo-Engravers Unions in the courts of New York. An appeal in the case of *People* v. *Epstean, supra,* was dismissed on the sole ground that the order sought to be appealed from was not reviewable. (179 N. Y. Supp. 941.) Subsequently the so-called Donnelly Anti-Trust Law, *supra,* was amended to bring within the purview thereof ''any article or product used in the conduct of trade, commerce or manufacture.'' In *Standard Engraving Co.* v. *Volz,* 200 App. Div. 758 [193 N. Y. Supp. 831], the court held that this anti-trust law, as amended, prohibited the labor unions from

establishing a minimum price at which the photo-engraving producers could sell their products. This minimum price had been established after the decision in *People* v. *Epstean, supra,* and in pursuance of the agreement between Photo-Engravers Board of Trade and the Photo-Engravers Union, as alleged in that case. In the course of its opinion in *Standard Engraving Co.* v. *Volz, supra,* the court quoted from *Curran* v. *Galen,* 152 N. Y. 33, 37 [57 Am. St. Rep. 496, 37 L. R. A. 802, 46 N. E. 297], as follows: "The social principle which justifies such organizations [referring to labor unions] is departed from, when they are so extended in their operation as either to intend, or to accomplish, injury to others." In view of the decision and the language of the court in *Standard Engraving Co.* v. *Volz, supra,* it may be seriously questioned whether the courts of New York would be inclined to follow the *dicta* in *People* v. *Epstean, supra,* tending to support the position of the defendants.

[5] Likewise, the validity of this agreement between the defendants and the labor unions cannot be sustained upon the authority of such cases as *Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581 [16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550, 98 Pac. 1027], *Pierce* v. *Stablemen's Union,* 156 Cal. 70 [103 Pac. 324], which hold that it is the right of every man to engage to work for or to deal with or to refuse to work for, or to deal with any man or class of men as he sees fit, whatever his motive or whatever the resulting injury, without being held in any way accountable therefor. The principle laid down in those cases only applies where the employees are pursuing lawful means to secure a betterment of their working conditions, or where they have in fact a grievance against the employer. (*Brescia Construction Co.* v. *Stone Masons Contractors' Assn., supra.*)

[6] Furthermore, the proviso in the Cartwright Act that labor, skilled or unskilled, is not a commodity within the meaning of the act does not authorize any such agreement as was here made between employers and employees. In *Duplex P. P. Co.* v. *Deering,* 254 U. S. 443, 469 [16 A. L. R. 196, 65 L. Ed. 349, 41 Sup. Ct. Rep. 172], Mr. Justice Pitney, in speaking of section 6 of the Clayton Act (Act of October 15, 1914, c. 323, 38 Stats. at Large, 730 [9 Fed. Stats. Ann., 2d ed., p. 737; U. S. Comp. Stats., sec. 8835f]), which declares, as does the Cartwright Act, that the labor

of a human being is not a commodity or article of commerce, said: "The section [section 6] assumes the normal objects of a labor organization to be legitimate, and declares that nothing in the anti-trust laws shall be construed to forbid the existence and operation of such organizations, or to forbid their members from *lawfully* carrying out their *legitimate* objects; and that such an organization shall not be held in itself—merely because of its existence and operation—to be an illegal combination or conspiracy in restraint of trade. But there is nothing in the section to exempt such an organization or its members from accountability where it or they depart from its normal and legitimate objects and engage in an actual combination or conspiracy in restraint of trade. And by no fair or permissible construction can it be taken as authorizing any activity otherwise unlawful, or enabling a normally lawful organization to become a cloak for an illegal combination or conspiracy in restraint of trade as defined by the anti-trust laws."

[7] Therefore, as this agreement between the labor unions and the defendants resulted in a combination or conspiracy in restraint of trade, it fell within the operation of the Cartwright Act, *supra,* notwithstanding the fact that some of the parties to the agreement were labor unions. And plaintiff, by alleging that it has been damaged by reason of the union men in its employ being called out in pursuance of this alleged agreement, stated a cause of action under this act for twofold damages.

[8] There are also allegations in the complaint that the defendants, in order to destroy the business of plaintiff and other nonmembers of the "Printers' Board of Trade," solicit the customers of plaintiff and other nonmembers and offer to do work for such customers at prices below the cost of production. It is also alleged that plaintiff and certain other printers do not possess all the necessary machinery to do certain portions of printing work, and that plaintiff and these other printers are compelled to let out this work to or purchase materials from such of the defendants as are equipped therefor; that the defendants have charged and do charge the members of said association much lower prices for such work and materials than they charge the plaintiff and other nonmembers. It is then averred that the defend-

ants charge plaintiff and other nonmembers of the ''Printers' Board of Trade'' unreasonable and exorbitant prices for such work, all for the purpose of destroying the business of plaintiff and other nonmembers, or, as the alternative of forcing plaintiff and other nonmembers to join said associations.

The plain inference from these allegations is that these acts were done by the defendants for the purpose of forcing the plaintiff into the alleged unlawful combination and thus strengthening their illegal organization and its potentialities for accomplishing its alleged objects. It may well be that these various acts in and of themselves are innocent and lawful. Certainly, for instance, the solicitation of trade is not prohibited by the Cartwright Act. Nor is such solicitation prohibited merely because the person so soliciting the trade is a member of a trust or conspiracy in restraint of trade. But these various acts of solicitation, as well as the other acts alleged to have been done by the defendants, if done by the members of a trust, as defined by the Cartwright Act, in pursuance of their unlawful conspiracy and to effectuate its illegal objects, may become unlawful. Thus in *Swift & Co.* v. *United States,* 196 U. S. 375, 396 [49 L. Ed. 518, 25 Sup. Ct. Rep. 276, see, also, Rose's U. S. Notes], Mr. Justice Holmes, discussing a demurrer to the bill in equity filed by the government for the purpose of enjoining the ''meat trust'' for alleged violation of the federal anti-trust statute, said: ''The scheme as a whole seems to us to be within reach of the law. The constituent elements, as we have stated them, are enough to give to the scheme a body and, for all that we can say, to accomplish it. Moreover, whatever we may think of them separately when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme. *It is suggested that the several acts charged are lawful and that intent can make no difference. But they are bound together as the parts of a single plan. The plan may make the parts unlawful.* Aikens v. Wisconsin, 195 U. S. 194, 206 [49 L. Ed. 154, 25 Sup. Ct. Rep. 3, see, also, Rose's U. S. Notes].'' (Italics ours.) Commenting upon this, and other quotations to the same effect, the court in *Monarch Tobacco Works* v. *American Tobacco Co.,* 165 Fed. 774, 780, observed that, ''The reasons

for the rule do not seem to lie very deep, it being conceivable that the object of every such combination could, and probably would, be consummated by acts which would be perfectly lawful if not done with the design to put the unlawful scheme into successful operation. The conspiracy and combination, though themselves unlawful, cannot injure any person either in his business or property so as to give him a cause of action under section 7 [of the Sherman Anti-Trust Law] unless something be done to make the combination and conspiracy effective; but whatever is done by those engaged in the scheme or plot with the motive and intent to carry out the unlawful purpose itself becomes tainted with the illegality of the scheme, however innocent it might otherwise have been, the separate acts becoming thereby so interwoven with the unlawful scheme as to cause the injury 'by reason' of the combination, within the language of section 7. It therefore seems that a series of acts, each of which may be innocent in itself, may be wrongful if the direct object, purpose, and result thereof be to carry into effect a combination agreement whereby the free flow of commerce between the states or the liberty of a trader to carry on his business is obstructed. . . . Sometimes an unlawful act may be done by means that appear to be lawful, just as a lawful act may be accomplished by means that are manifestly unlawful.''

It is the contention of the defendants that so long as they were doing lawful acts, their motives in so doing these acts were immaterial. This court has often expressed the fundamental rule that bad motives do not of themselves make an otherwise legal act illegal. (*Union Labor Hospital Assn.* v. *Vance Lumber Co.*, 158 Cal. 551 [33 L. R. A. (N. S.) 1034, 112 Pac. 886]; *Pierce* v. *Stablemen's Union*, 156 Cal. 70 [103 Pac. 324]; *Parkinson Co.* v. *Building Trades Council*, 154 Cal. 581 [16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550, 98 Pac. 1027].) But, as pointed out by Mr. Justice Holmes in *Swift & Co.* v. *United States, supra*, if various acts are done in pursuance of a plan or scheme, the apparently lawful acts become so interwoven with the clearly illegal acts as to render them indistinguishable. This we believe is the situation here presented, assuming, of course, that plaintiff's allegations are true, and it would in effect emasculate the

anti-trust law to say that various acts done by the members of an alleged trust, in pursuance of the conspiracy against trade, do not lose their innocent character, and become illegal. The view which we take is well illustrated by the following quotation from *Munter* v. *Eastman Kodak Co.,* 28 Cal. App. 660, 667 [153 Pac. 737] : "In other words, it was and is within its legitimate province as a manufacturer and wholesale vendor to select its own customers, and, moreover, to sell at higher prices to one than to another, *provided, of course, that such discrimination in prices is not the result of a combination, agreement, or conspiracy between it and others, the object of which was or is to monopolize or restrict trade or commerce or to prevent legitimate competition, or otherwise to injure the public, the protection of whose welfare is the first consideration of all anti-trust legislation."* Citing cases. (Italics ours.) Applying these principles to this case, the defendants could select their customers, or refuse to sell to plaintiff or anyone else, except on their own terms and prices, just so long as they were not acting in pursuance of a conspiracy to restrain trade. In other words, acts having a direct causal connection or relation to the existence of a trust, when done by such a trust may lose their legal character and become illegal. And it is the theory of the plaintiff, and it so alleges, that the defendants constitute a trust, as defined by the Cartwright Act, with its dominant purpose to sell its goods at increased prices, and that all of the acts alleged to have been done by the defendants were done by them as members of this alleged trust, and to further the illegal object of the alleged trust. We are of the opinion that in these allegations the plaintiff has brought itself within the purview of the Cartwright Act.

[9] While it is necessary for the plaintiff, in order to recover under the Cartwright Act, to show that actual damages were sustained—damages in some amount which are susceptible of expression in figures and not dependent upon the conjecture of a jury (*American Sea Green Slate Co.* v. *O'Halloran,* 229 Fed. 77 [143 C. C. A. 353]), this is a question of proof, and we see no reason why the plaintiff should in this action be required to itemize its damages in its complaint. (See *Monarch Tobacco Works* v. *American Tobacco Co., supra,* p. 783.)

For the reasons above indicated we are constrained to reverse the judgment, with directions to the trial court to overrule the demurrer.

Waste, J., Lawlor, J., Seawell, J., Myers, J., Lennon, J., and Wilbur C. J., concurred.

Rehearing denied.