[Civ. No. 22156 First Dist., Div. Two. Nov. 19, 1965.]

THE PEOPLE, Plaintiff and Appellant, v. SANTA CLARA
VALLEY BOWLING PROPRIETORS' ASSOCIATION
et al., Defendants and Respondents.

Thomas C. Lynch, Attorney General, Wallace Howland, Assistant Attorney General, Mervin R. Samuel, Deputy Attorney General, and Keith E. Pugh, Jr., for Plaintiff and Appellant.

Doyle & Clecak and William P. Clecak for Defendants and Respondents.

TAYLOR, J.—The sole question presented on this appeal is the adequacy of the injunctive relief afforded to the state in its action against restraints of trade by defendants, the Santa Clara Valley Bowling Proprietors' Association (hereafter called Santa Clara), the Northern California Bowling Proprietors' Association (hereafter called Norcal), and naming as coconspirator the Bowling Proprietors' Association of America (hereafter called BPAA). Although the complaint, filed in 1960, charged defendants with conspiring in several types of restraints of trade, including price-fixing and bid-rigging, in violation of sections 16720 and 16727 of the Business and Professions Code (hereafter called the Cartwright Act), only the bowling tournament eligibility rule adopted in 1961 (hereafter called the modified eligibility rule) is in issue here.

The trial court found that defendants had conspired to violate the Cartwright Act and granted the state all of the equitable relief requested except an injunction against the use and enforcement of the modified eligibility rule. The findings of fact and conclusions of law establish that defendants' practices of fixing prices by agreement, bid-rigging, and adopting a code of ethics with enforcement provisions, were unreasonable restraints of trade, and that the former tournament eligibility rules (hereafter called the former Norcal rule and the BPAA rule, respectively), constituted a group boycott, secondary boycott and tie-in agreement, in violation of the Cartwright Act.

As defendants have abandoned their appeal, we are concerned only with paragraph V of the judgment.[1] The state argues that the trial court erred in failing to provide therein that defendants were to be enjoined from adopting any eligi-

---

[1] "Each defendant is perpetually enjoined and restrained from directly or indirectly or in any manner adopting, advertising, participating in, adhering to, applying or enforcing any by-law, rule, regulation, agreement, contract, understanding, practice, procedure or arrangement of any kind or nature whatsoever which has the purpose or effect, directly or

bility rule requiring that a bowler must bowl all *or any* of his league play in member establishments and that, therefore, the injunction in its present form is inadequate to enforce the judgment rendered.

While a full exposition of all matters treated in the briefs might serve better to illuminate the controversy, this could be accomplished only by extending this opinion beyond readable limits. Inasmuch as questions of law only are presented, it will be sufficient to state generally the salient facts about the defendant and coconspirator organizations, the bowling business, and the nature and effect of the modified eligibility rule.

Defendants and the coconspirator are nonprofit corporate associations established to promote the common interests of owners and operators of bowling establishments. Defendant Santa Clara, the local organization, has a membership of all but two (87 per cent) of the bowling establishments in the San Jose area of Santa Clara County; defendant Norcal, the regional organization, a membership of 210 (88 per cent) of the 240 bowling establishments in the geographic area bounded by the Oregon border on the north and Pismo Beach and Delano on the south. Both Santa Clara and Norcal are affiliated with BPAA, the national organization, which, with a membership of 5,488 bowling establishments in the United States and Canada and with its various affiliates, owns or controls fairly close to 90 per cent of all bowling lanes in the United States. BPAA promulgated by-laws, tournament rules and regulations which are binding on its members and affiliated associations.

One of the purposes of BPAA is to foster the formation of state, city and district bowling proprietor associations and to urge their affiliation with the national organization on the condition that each affiliate require its members to become members of BPAA. Membership in Norcal is limited to proprietors who are members in good standing of local associations. Under BPAA by-laws, no affiliate organization has authority to accept a proprietor for local or state membership only, as members of affiliated organizations must become

---

indirectly, of requiring as a condition of eligibility to participate in or to receive a prize or award in any bowling tournament, bowling contest, bowling program or bowling activity that a bowler must bowl all of his or her league play or other bowling activities in establishments which are members of BPAA, Northern Association, Santa Clara Association, or any other bowling proprietors' association."

members of BPAA. Loss of membership in the local association results in loss of membership in the regional association; in turn, loss of membership in the regional association results in the loss of membership in the national association. The board of directors of BPAA is composed of members selected by its affiliated organizations, including Norcal.

In February 1960, Norcal adopted its former rule limiting eligibility to participate in tournaments approved by Norcal to bowlers who confined their league and tournament bowling exclusively to BPAA member establishments and to bowlers who signed agreements to desist immediately from participating in organized bowling in any and all competing bowling establishments not members in good standing of Norcal or other BPAA affiliated associations. In June 1960, BPAA amended its by-laws to include a rule providing that no adult bowler was eligible to participate in tournaments sponsored or conducted by BPAA or any of its affiliated associations unless such bowler confined his league tournament and advertised exhibition bowling exclusively to establishments who were members in good standing of BPAA. In June 1960, Norcal adopted the BPAA rule in place of its own prior rule. In June of 1961, BPAA removed the above mentioned rule from its by-laws and limited its applicability to the six national tournaments it conducted or sponsored annually in northern California.

Thereafter, on July 14, 1961, Norcal adopted the modified eligibility rule here in issue. This rule, used in all tournaments sponsored or sanctioned by Norcal and its affiliates after that date, reads as follows: "All bowlers who bowl regularly in at least one league in a membership house (21-game established average required) shall be eligible to participate in tournaments conducted by Northern California Bowling Proprietors' Association and its members; this rule shall apply to all tournaments given Blue Ribbon and General approval and also to those tournaments for which members display posters, advertising or otherwise solicit the support of fellow members."

A brief description of the bowling business is necessary for an understanding of the issue here presented. Bowlers who bowl individual games are engaged in "open play." A substantial number of bowlers engage in competition as members

of various leagues.[2] A league is composed of six to forty teams with four or five bowlers per team. Leagues generally enter into agreements[3] with bowling establishments for each season[4] and bowl periodically, usually weekly, during such time. League bowling is essential to the profitable operation of a bowling establishment and constitutes 50 per cent or more of the total lineage bowled in an average establishment. In addition, league bowlers bowl about one-third of all the "open play" in an establishment and are a major source of bar and restaurant revenue.

A number of bowlers, both as individuals and as members of league teams, participate in bowling tournaments that are generally of two types: "house tournaments" sponsored or conducted by bowling proprietors, including members of defendants' organizations, and tournaments sponsored or conducted by nonprofit organizations. Both types of tournaments produce business for the bowling establishments in which they take place. "House tournaments" often provide substantial cash prizes for the winners from a prize fund created from the entry fees paid by the participating bowlers or, in some instances, from contributions of the individual bowling establishment, or the affiliated association conducting the tournament, or the BPAA.

BPAA annually sponsors or conducts six national tournaments in northern California. The elimination rounds for the national tournaments are conducted by Norcal through its members. In addition, Norcal conducts four regional tournaments of its own and approves some of the tournaments of its individual members.[5] Many members of Norcal, however, conduct their own tournaments without requesting the approval of Norcal.

---

[2] Sixty-five per cent of all leagues are formed by trade, professional or fraternal groups; the remainder by bowling establishments for revenue-producing purposes.

[3] The contract specifies the price to be paid for the league's bowling, the period of time during which the league undertakes to bowl, and the hour and location of its bowling with the establishment. The individual bowler is under an obligation to bowl the complete season for which the contract is made. He can withdraw from the league only if he provides a replacement bowler. Failure to provide a replacement subjects him to possible suspension from membership in the bowlers' associations.

[4] The winter season of 30-33 weeks lasts from September through May; the summer season of 12 weeks from May until August.

[5] In 1959, Norcal approved 30 such tournaments; in 1962, 48; during the first 8 months of 1963, 34.

Virtually all of the over seven million league bowlers in the United States belong to one of two nonprofit associations of bowlers: the American Bowling Congress, the men's organization (hereafter called ABC); and the Women's International Bowling Congress (hereafter called WIBC). Neither ABC nor WIBC has any interest in the financial success of any bowling establishment. Their primary purpose is to standardize the bowling conditions and equipment under which their members bowl throughout the country. Both, through their local associations, "certify" and "sanction" the leagues and tournaments. Eighty-five per cent of all tournaments and 90 per cent of the leagues are so sanctioned. Both ABC and WIBC record, tabulate and publish established bowling averages for all of their members.

Approximately 80 per cent of league bowlers in the Santa Clara area bowl in only one league per season.[6] Twenty-five per cent of league bowlers are interested in engaging in the local or regional tournaments. Of this 25 per cent of league bowlers interested in engaging in local or regional tournaments, the great majority are to be found in the 20 per cent of league bowlers who bowl in more than one league. Those bowlers interested in tournaments consider it important to their status to be eligible to participate in tournaments.

The court here specifically found that the tournament eligibility rules of both BPAA and Norcal, either as originally stated or as subsequently modified, had and have no adverse effect on nonmember competition in Santa Clara County, but concluded that the former Norcal rule and the BPAA rule were secondary boycotts and tie-ins in violation of the Cartwright Act. The court, however, found that the modified eligibility rule did not constitute a violation of the Cartwright Act as it imposed only a reasonable requirement for participation in tournaments sponsored or approved by Norcal and its members.

The state contends that the modified eligibility rule is not substantially different from its predecessors, is likewise a secondary boycott and tie-in agreement and, as such, is illegal per se. Defendants contend that the so-called "rule of

[6]As a league season consists of about 100 games, usually three games per week in each of the 30-33 weeks of the season, there are obvious practical limitations in the number of leagues any one bowler can participate in. A national survey made by ABC in 1956-57, indicated that 89 per cent of its then 2.5 million members bowled in only one league.

reason" must be applied to determine whether the modified eligibility rule imposes unreasonable restraints of trade in violation of the Cartwright Act. Thus, the question presented is one of law (*Roberts* v. *Fuquay-Varina Tobacco Board of Trade, Inc.*, 223 F.Supp. 212, 214), namely, whether the trial court applied the proper standard to essentially undisputed facts.[7] (*United States* v. *Parke, Davis & Co.*, 362 U.S. 29, 44-45 [80 S.Ct. 503, 4 L.Ed.2d 505].)

■ Cases decided under the federal Sherman Anti-Trust Act[8] and the common law policy against restraint of trade are applicable to problems arising under the Cartwright Act (*People* v. *Building Maintenance etc. Assn.*, 41 Cal.2d 719 [264 P.2d 31]; *Speegle* v. *Board of Fire Underwriters*, 29 Cal.2d 34 [172 P.2d 867]; *Shasta Douglas Oil Co.* v. *Work*, 212 Cal.App.2d 618, 625 [28 Cal.Rptr. 190]; *Tatkin* v. *Superior Court*, 160 Cal.App.2d 745, 757 [326 P.2d 201]; *Milton* v. *Hudson Sales Corp.*, 152 Cal.App.2d 418, 440 [313 P.2d 936]; *Rolley, Inc.* v. *Merle Norman Cosmetics, Inc.*, 129 Cal.App.2d 844, 849, 851 [278 P.2d 63, 282 P.2d 991]).

When the Sherman Act incorporated the common-law principles on restraint of trade into federal statutory law, it imported both the principle that restrictions on competition are illegal and also the principle that in some circumstances a showing of reasonableness will legalize restrictions on competition. When the question was first presented to the United States Supreme Court under the Sherman Act, it was held that the justification of reasonableness was not available as a defense to a combination which had the effect of restraining trade (*United States* v. *Joint Traffic Assn.* (1898) 171 U.S. 505 [19 S.Ct. 25, 43 L.Ed. 259]; *United States* v. *Trans-Missouri Freight Assn.* (1897) 166 U.S. 290, 328 [17 S.Ct. 540, 41 L.Ed. 1007]), and it was intimated that the question of reasonableness was not open to the courts in these actions at common law. (*Addyston Pipe & Steel Co.* v. *United States* (1899) 175 U.S. 211, 237-238 [20 S.Ct. 96, 44 L.Ed. 136]). However, in the classic cases of *Standard Oil Co.* v. *United*

---

[7]Defendants erroneously characterize the issue as one of fact, i.e., the sufficiency of the evidence to sustain the court's findings and conclusions about the modified eligibility rule. Since defendants have abandoned their appeal, the sufficiency of the evidence is not in issue and must be presumed.

[8]Cases based on the Clayton Act, however, are not applicable since that act is broader in its scope and prohibitions (*Rolley, Inc.* v. *Merle Norman Cosmetics, Inc.*, 129 Cal.App.2d 844 [278 P.2d 63, 282 P.2d 991]).

*States,* 221 U.S. 1 [31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A. N.S. 34], and *United States* v. *American Tobacco Co.,* 221 U.S. 106 [31 S.Ct. 632, 55 L.Ed. 663], the U. S. Supreme Court established the celebrated so-called "rule of reason" by holding that not all restraints of interstate commerce are within the ambit of the Sherman Act, but only those restraints that are undue or unreasonable, and it has been held by our Supreme Court that the broad prohibitions of the Cartwright Act are subject to an implied exception similar to the one that validates reasonable restraints of trade under the Sherman Act (*People* v. *Building Maintenance etc. Assn.,* 41 Cal.2d 719, 727 [264 P.2d 31]).

In response to the attempts of antitrust defendants to justify every restrictive combination on the ground that, in the light of all the economic facts and conditions, the particular practice assailed was reasonable, the federal cases have developed a doctrine of so-called "per se" violations, i.e., acts which are held to be prohibited by the antitrust laws regardless of any asserted justification or alleged reasonableness (*Las Vegas Merchant Plumbers Assn.* v. *United States,* (9th Cir. 1954) 210 F.2d 732, cert. denied, 348 U.S. 817 [75 S.Ct. 29, 99 L.Ed. 645]). Although for convenience and brevity, the courts have used the "illegal per se" terminology, an analysis indicates that it does not denote an arbitrary rigid classification, but rather encompasses certain practices that normally tend to eliminate competition. As the United States Supreme Court recently stated in *Northern Pac. Ry. Co.* v. *United States,* 356 U.S. 1 [78 S.Ct. 514, 2 L.Ed.2d 545] : "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition." (P. 4.)

"However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as

to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 210 [60 S.Ct. 811, 84 L.Ed. 1129]; division of markets, *United States* v. *Addyston Pipe & Steel Co.*, 85 F. 271 [29 C.C.A. 141, 46 L.R.A. 122]; affd., 175 U.S. 211 [20 S.Ct. 96, 44 L.Ed. 136]; group boycotts, *Fashion Originators' Guild* v. *Federal Trade Com.*, 312 U.S. 457 [61 S.Ct. 703, 85 L.Ed. 949]; and tying arrangments[9], *International Salt Co.* v. *United States*, 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20].'' (P. 5.)

■ The ''per se'' doctrine means that a particular practice and the setting in which it occurs is sufficient to compel the conclusion that competition is unreasonably restrained and the practice is consequently illegal. ■ In the ''rule of reason'' category, however, the conclusion does not follow from the mere showing of the conduct and its setting, but requires the complicated and prolonged economic investigation to produce evidence that warrants an inference that the purpose of the actor or the actual or probable consequences of the act was to hinder competition, as well as on probable competitive effects. ■ As one eminent commentator has pointed out, the difference between the per se and rule of reason categories lies in the kind and quantum of evidence required to establish violations (Loevinger, *The Rule of Reason in Antitrust Law* (1964) 50 Va.L.Rev. 23, 34).

---

[9]Although *Timken Roller Bearing Co.* v. *United States* (1951) 341 U.S. 593 [71 S.Ct. 971, 95 L.Ed. 1199], and *White Motor Co.* v. *United States* (1963) 372 U.S. 253 [83 S.Ct. 696, 9 L.Ed.2d 738], indicate that only certain tying arrangements are in the per se category, the court indicated in the *Northern Pac.* case, at page 6, that tying agreements ''are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected.''

The question here presented is whether the modified eligibility rule is a practice of the same nature and occurs in the same setting as its predecessor eligibility rules and likewise compels the conclusion that it is illegal. Defendants' contention that there is no such ''per se'' category under the Cartwright Act is negated by *People* v. *Inland Bid Depository*, 233 Cal.App.2d 851 [44 Cal.Rptr. 206], which likewise involved the effectiveness of the injunctive relief granted by the court below.

It is unnecessary for us to set forth the public policy against group boycotting in great detail (see *Mandeville Island Farms* v. *American Crystal Sugar Co.*, 334 U.S. 219 [68 S.Ct. 996, 92 L.Ed. 1328]; *Silver* v. *New York Stock Exchange*, 373 U.S. 341 [83 S.Ct. 1246, 10 L.Ed.2d 389]; *People* v. *Sacramento Butchers' Protective Assn.*, 12 Cal. App. 471, 481 [107 P. 712]; *Standard Sanitary Mfg. Co.* v. *United States*, 226 U.S. 20 [33 S.Ct. 9, 57 L.Ed. 107]; *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150 [60 S.Ct. 811, 84 L.Ed. 1129]; *Northern Pac. Ry. Co.* v. *United States*, 356 U.S. 1 [78 S.Ct. 514, 2 L.Ed.2d 545]; and *People* v. *Building Maintenance etc. Assn.*, 41 Cal.2d 719, 727 [264 P.2d 31]). Group boycotts are illegal per se (see *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U.S. 207 [79 S.Ct. 705, 3 L.Ed.2d 741]; *United States* v. *Frankfort Distilleries*, 324 U.S. 293 [65 S.Ct. 661, 89 L.Ed. 951]; *Associated Press* v. *United States*, 326 U.S. 1 [65 S.Ct. 1416, 89 L.Ed. 2013]; *Radiant Burners, Inc.* v. *Peoples Gas Light & Coke Co.*, 364 U.S. 656 [81 S.Ct. 365, 5 L.Ed.2d 358]; *Eastern States Retail Lumber Dealers' Assn.* v. *United States*, 234 U.S. 600 [34 S.Ct. 951, 58 L.Ed. 1490, L.R.A. 1915A 788]; *Overland Publishing Co.* v. *H. S. Crocker Co.*, 193 Cal. 109 [222 P. 812]; *Speegle* v. *Board of Fire Underwriters*, 29 Cal.2d 34 [172 P.2d 867]).

The leading and controlling case (also followed in *People* v. *Inland Bid Depository, supra*) is *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U.S. 207 [79 S.Ct. 705, 3 L.Ed.2d 741]. In that case, the plaintiff, a retail radio, television, and appliance dealer in San Francisco, alleged a conspiracy of a number of important suppliers, together with a retail competitor, either not to sell to the plaintiff or to sell to him only at discriminatory prices and highly unfavorable terms. It was further alleged that the retail competitor, a chain of stores with one located close to the plaintiff's store, had used

"monopolistic" buying power to bring about these results. No reason, purpose, or motive for the combination was alleged. No specific effects were stated other than damage to the plaintiff. The conclusionary allegation averred that the conspiracy was in "restraint of trade" and monopolistic, contrary to sections 1 and 2 of the Sherman Act, and that competition in commerce in the particular products involved was substantially lessened, limited, and restrained. The defendants moved for a summary judgment and argued that the matters alleged constituted no violation because the affidavits indicated that there were numerous other dealers in the same appliances in the market area and many other brands of the same types of products, not covered by the conspiracy were available to the public. The defendants prevailed below on the grounds that no per se offense was alleged and that it was incumbent on the plaintiff to show some substantial restriction of competition or that the public could conceivably suffer injury (*Klor's, Inc.* v. *Broadway-Hale Stores, Inc.* (9th Cir. 1958) 255 F.2d 214, 236).

The Supreme Court reversed unanimously and ordered the case to trial. The court held that the complaint alleged a boycott and that this boycott was within the per se category regardless of whether elimination of the plaintiff would have any significant economic effect. The court said at pages 212 and 213: "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they 'fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality.' *Fashion Originators' Guild* v. *Federal Trade Com.*, 312 U.S. 457, 466, 467-468 [61 S.Ct. 703, 85 L.Ed. 949]. Cf. *United States* v. *Trenton Potteries Co.*, 273 U.S. 392 [47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989]. Even when they operated to lower prices or temporarily to stimulate competition they were banned. For, as this Court said in *Kiefer-Stewart Co.* v. *Seagram & Sons*, 340 U.S. 211, 213 [71 S.Ct. 259, 95 L.Ed. 219], 'such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.' Cf. *United States* v. *Patten*, 226 U.S. 525, 542 [33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A. N.S. 325].

"Plainly the allegations of this complaint disclose such a boycott. This is not a case of a single trader refusing to deal

with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship. Alleged in this complaint is a wide combination consisting of manufacturers, distributors and a retailer. This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale, and in some instances forbids them from selling to it on any terms whatsoever. It interferes with the natural flow of interstate commerce. It clearly has, by its 'nature' and 'character,' a 'monopolistic tendency.' As such it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups.''

The court in *Klor* emphasized the fact that the innate illegality of a boycott, like that of a conspiracy, springs from the fact of combination, the agreement to do collectively that which any one acting alone and independently, could do without violating the law (*Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U.S. 600, 614 [34 S.Ct. 951, 58 L.Ed. 1490, L.R.A. 1915A 788] ; *Overland Publishing Co.* v. *H. S. Crocker Co.,* 193 Cal. 109, 121 [222 P. 812]), so that any factual showing of the effect on competition was not relevant. The holding of the *Klor* case was recently reaffirmed in *White Motor Co.* v. *United States,* 372 U.S. 253, 259 [83 S.Ct. 696, 9 L.Ed.2d 738].

Thus the trial court's finding in the instant case that the modified eligibility rule had no effect on competition is not relevant. It made the same finding concerning the effect of the prior rules. The application of this finding to both prior and modified rules only serves to emphasize the fact that the court properly applied the per se doctrine in nullifying the prior rules and improperly applied the ''rule of reason'' in approving the modified eligibility rule.

The court here concluded that the BPAA rule and former Norcal rules were secondary boycotts as they constituted agreements to coerce bowlers to refrain from dealing with non-BPAA members. It also concluded that they resulted in an arrangement which tied and conditioned the sale of par-

ticipation in proprietor tournaments upon the purchase from a BPAA member establishment of a bowler's entire requirement of league (or league, tournament and advertised exhibition) bowling. Defendants argue that the trial judge correctly held the modified eligibility rule dissimilar because it does not require that a bowler bowl *all* of his league games in a member establishment, but only those in one league in which he participates. Admittedly, since the majority of bowlers interested in local and regional tournaments are found in the 20 per cent[10] of all league bowlers who bowl in more than one league, a somewhat smaller amount of league play is affected by the modified rule. But exclusivity is not the determinative factor. As indicated in *Klor,* the basic issue is whether a *particular practice* is objectionable because, by nature, it generally tends to lessen competition and create monopoly.

The matter was most perceptively stated in *Osborn* v. *Sinclair Refining Co.* (4th Cir. 1960) 286 F.2d 832, cert. denied, 366 U.S. 963 [81 S.Ct. 1924, 6 L.Ed.2d 1255], wherein a gasoline distributor required its dealers to buy substantial quantities of Goodyear tires, batteries and accessories as a condition to the purchase of the gasoline. The court said: "Nor do we think a tie-in escapes condemnation as an unreasonable per se restraint of trade because the buyer is not obligated to obtain all his requirements of the tied product from the seller. . . . *It is the restrictive nature of the agreement, not the fact of exclusivity, which is objectionable."* (P. 838.) "It matters not that the plaintiff was not forced to purchase his entire requirements in Goodyear merchandise. Certainly, *insofar as he and other dealers were compelled to carry Goodyear, to that extent competition in TBA was curbed."* (P. 839.) (Italics supplied.)

 The gravamen of the offense against the Cartwright Act is the *mere formation of the combination or conspiracy for the unlawful purpose of restraining trade (People* v. *Sacramento Butchers' Protective Assn.,* 12 Cal.App. 471, 492 [107 P. 712]). As to purpose, the court found that the prior rules were adopted *for the primary purpose of in-*

---

[10]As the parties agree that there are approximately 190,000 men and women league bowlers in northern California, about 152,000 bowl in only one league; 38,000 in more than one league; the number interested in local or regional tournaments is 47,000; the great majority of the 47,000 interested in local or regional tournaments are to be found in the 38,000 who bowl in more than one league.

*ducing league bowlers bowling in leagues in nonmember houses to cease doing so and thus suppress the competition from nonmember establishments,* while the modified eligibility rule had, *as one of its purposes, to induce league bowlers bowling in nonmember houses to bowl in member houses* without, however, requiring them to cease bowling in nonmember houses. Thus the distinction between the modified and prior rules is one of degree only and not of purpose.

Since the findings and conclusions of the trial court affirming the conspiracy of defendants and their other illegal acts are not in question, the modified eligibility rule must be viewed as a part of the total conspiracy and not as an isolated element. When defendants are shown to have entered into a conspiracy in violation of the antitrust laws, the courts will not assume that it has been abandoned without clear proof *(United States v. Oregon State Medical Soc.,* 343 U.S. 326, 333 [72 S.Ct. 690, 96 L.Ed. 978] ; *United States v. Parke, Davis & Co.,* 362 U.S. 29 [80 S.Ct. 503, 4 L.Ed.2d 505]).

 The fact that the prior rules were adopted in furtherance of the conspiracy cannot be questioned. The uncontroverted evidence indicated that the modified rule was adopted at a meeting of the Norcal board of directors on July 14, 1961, some seven months after the filing of the complaint herein. Under such circumstances, it is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform especially when abandonment seems timed to anticipate suit and there is probability of resumption *(United States v. Oregon State Medical Soc., supra,* at p. 333). The record is devoid of any evidence indicating that the modified rule was adopted after an abandonment of the conspiracy that tainted the prior rules. In fact, the only inference that can be drawn from the record is to the contrary. We refer particularly to BPAA's November 1960 Member Service Bulletin which urged members to accentuate the positive aspects of the tournament eligibility rules and ''let them figure out the consequences for themselves.'' The wording of the modified eligibility rule adopted a few months later is in the affirmative, while all of the prior rules were worded negatively.

When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be

closed. The usual ways to the prohibited goal may be blocked against the proven transgressor and the burden put upon him to bring any proper claims for relief to the court's attention (*International Salt Co.* v. *United States,* 332 U.S. 392, 400 [68 S.Ct. 12, 92 L.Ed. 20]). ▮ Thus under the Cartwright Act, it is enough to show that either the purpose of the combination (*People* v. *Sacramento Butchers' Protective Assn.,* 12 Cal.App. 471, 492 [107 P. 712]) or the means used (*Overland Publishing Co.* v. *H. S. Crocker Co.,* 193 Cal. 109 [222 P. 812]) were unlawful.

▮ We agree, therefore, with the state's argument that the modified eligibility rule does not provide any legally significant basis for different treatment than the prior rules, as the only factual difference between them is in the amount of bowling which each requires from a bowler who wishes to participate in the various tournaments sponsored by the members or affiliates of the defendant organizations. We think that the trial court erred in applying the "rule of reason" to the modified eligibility rule and in concluding that it was not a secondary boycott and tie-in like the prior rules.

▮ The determination of the scope of the decree to accomplish its purpose is peculiarly the responsibility of the trial court. Its opportunity to know the record and to appraise the need for prohibitions or affirmative actions normally exceeds that of any reviewing court. Notwithstanding our adherence to trial court responsibility in the molding of a decree as the wisest practice and the most productive of good results, the question is not simply one of abuse of discretion subject only to reversal for gross abuse. Rather, reviewing courts have felt an obligation to intervene in this most significant phase of the case when they conclude that there are inappropriate provisions in the decree. ▮ In resolving doubts as to the desirability of including provisions designed to restore future freedom of trade, courts should give weight to the fact of total conspiracy as well as the other circumstances under which the illegal acts occur. ▮ " '. . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *United States* v. *Patten,* 226 U.S. 525, 544 [33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A. N.S. 325]. . . .' " (*Continental Ore Co.* v. *Union Carbide etc. Corp.* (1962) 370 U.S. 690, 699 [82 S.Ct. 1404, 8 L.Ed.2d 777].)

The proper disposition of antitrust cases is obviously one of great public importance and their remedial phase, more often than not, is crucial. For the suit has been a futile exercise if the government proves a violation but fails to secure a remedy adequate to redress it. Where such is the case, the state has won a lawsuit and lost a cause. Accordingly, paragraph V of the decree must be modified to enjoin defendants from adopting any eligibility rule requiring that a bowler must bowl all *or any* of his league play in establishments that are members of defendants' organizations.

The judgment is affirmed in all respects except as to paragraph V, which is reversed. The trial court is directed to modify its decree to conform to the views expressed in this opinion.

Shoemaker, P. J., and Agee, J., concurred.